

**Signed June 14, 2013.**

_____
**H. CHRISTOPHER MOTT**
**UNITED STATES BANKRUPTCY JUDGE**
_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE No. 12-11978-HCM |
| SCC KYLE PARTNERS, LTD., | § | |
| | § | |
| Debtor. | § | CHAPTER 11 |

### CONSOLIDATED OPINION REGARDING
### CONFIRMATION OF PLAN OF REORGANIZATION AND RELATED MOTIONS

***You can't always get what you want, but you get what you need.***[1]

This Chapter 11 single asset real estate case presents a somewhat rare setting—the debtor's secured creditor is definitively and vastly oversecured, yet the debtor's plan of reorganization contains sizable risk for the secured creditor. On one side, the debtor wants a low cramdown interest rate and the time to finish its ongoing sales of real estate to pay off the secured creditor, and needs to use a limited portion of the sales proceeds to complete the plan. On the other side, the secured creditor wants to foreclose its liens and take the equity in the real estate now, because it is tired of waiting to be completely paid off in full. Given these wants and needs, the Court finds it necessary to impose a relatively high cramdown interest rate to confirm the plan and ensure the secured creditor is completely compensated for the risk and delay. In the Court's view, neither party will get all they want, but both will get what they need.

---

[1] *Rolling Stones*, circa 1969.

# I.
# INTRODUCTION

## A. HEARING AND CONSOLIDATED OPINION

On April 4 and 16, 2013, the Court conducted a consolidated hearing ("Hearing") with respect to the following contested matters: (1) confirmation of the Amended Plan of Reorganization (dkt# 49), as modified (dkt# 98, 100, 102, 107, and 125) (collectively the "Plan") filed by SCC Kyle Partners, Ltd. ("Debtor"), and the objections thereto filed by its lender, Whitney Bank (dkt# 68, 101); (2) the Motion to Dismiss Case or to Convert Debtor's Case to Chapter 7 ("Motion to Dismiss") (dkt# 57) filed by Whitney Bank; and (3) the Motion for Relief from the Automatic Stay ("Motion for Relief") (dkt# 59) filed by Whitney Bank (collectively "Contested Matters").

The Court consolidated the Hearing and evidence on all of the Contested Matters under Rules 7042(a)(1) and 9014(c) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") due to the common questions of fact and law, as well as the common witnesses, exhibits and evidence with respect to the Contested Matters.

This consolidated Opinion ("Opinion") constitutes the Court's findings of fact and conclusions of law with respect to each of the Contested Matters in accordance with Bankruptcy Rules 7052(a)(1) and 9014(c).[2] In reaching the findings and conclusions set forth in this Opinion, the Court has considered and weighed all the evidence, the credibility of the testimony, admitted exhibits, arguments of counsel, and pleadings and briefs filed by all parties with respect to the Contested Matters, regardless of whether or not they are specifically referred to in this Opinion.[3]

## B. JURISDICTION

The Court has jurisdiction over confirmation of the Plan, the Motion for Relief, and the Motion to Dismiss under 28 U.S.C. §§157 and 1334. These Contested Matters arise in a bankruptcy case referred to this Court by the Standing Order of Reference entered in this District. The Contested Matters are core proceedings pursuant to 28 U.S.C. §157(b)(2)(A), (G), (L), and (N). The Court is authorized to enter a Final Order with respect to confirmation of the Plan, the Motion for Relief, and the Motion to Dismiss.

---

[2] To the extent any finding of fact is construed to be a conclusion of law in this Opinion, they are hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact in this Opinion, they are hereby adopted as such.

[3] Cents (pennies) are intentionally omitted by the Court in the dollar figures used in this Opinion.

**II.**
**PROCEDURAL BACKGROUND**

## A. BANKRUPTCY CASE—PROCEDURAL BACKGROUND

On August 31, 2012, SCC Kyle Partners, Ltd. (herein <u>Debtor</u>") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor owns commercial real estate ("<u>Kyle Property</u>") in a development known as the "Village at Kyle", which is located in the City of Kyle, Texas.

Whitney Bank, individually and as agent for a group of lenders (herein collectively "<u>Whitney Bank</u>") is the major secured creditor of the Debtor. Whitney Bank was owed about $14.3 million as of the bankruptcy filing, secured by the Kyle Property and other assets of the Debtor.

On October 10, 2012, Whitney Bank filed a Motion for determination that the Kyle Property owned by the Debtor was "single asset real estate" ("<u>SARE</u>") under §101(51B) of the Bankruptcy Code (dkt# 15). By Order entered November 9, 2012, the Court granted such Motion, determined that the Kyle Property was SARE, and §362(d)(3) of the Bankruptcy Code therefore applied to the Debtor's case (dkt# 18).

## B. CONTESTED MATTERS—PROCEDURAL BACKGROUND

### 1. Plan of Reorganization

On November 29, 2012, the Debtor filed a Chapter 11 Plan of Reorganization and proposed Disclosure Statement (dkt# 32, 33). The Debtor's Plan of Reorganization was filed within 90 days of its bankruptcy filing. Objections to the Disclosure Statement were filed by the U.S. Trustee and Whitney Bank. The Debtor filed an Amended Disclosure Statement to resolve such objections, and an Amended Chapter 11 Plan of Reorganization ("<u>Amended Plan</u>") on January 21, 2013 (dkt# 49, 50). On January 22, 2013, the Court entered an Order approving the Debtor's Amended Disclosure Statement, authorized the Debtor to solicit votes from creditors on the Amended Plan, established February 25, 2013 as the deadline for creditors to vote to accept or reject the Amended Plan and file any objections, and set the hearing on confirmation of the Amended Plan for March 7, 2013 ("<u>Disclosure Statement Order</u>") (dkt# 51).

Subsequently, the Debtor filed a First Modification, Second Modification, Amended Second Modification, and Second Amended Second Modification with Exhibit A, to its Amended Plan (collectively "<u>Plan Modifications</u>") (dkt# 98, 100, 102, 107, 125). The First Modification was filed by the Debtor prior to commencement of the Plan confirmation hearing. During the course of the Plan confirmation hearing, the Debtor announced oral modifications and clarifications to the Amended Plan. The Court requested the Debtor to reduce such oral Plan modifications and clarifications to writing, which the Debtor did by filing the Second Modification, Amended Second Modification, and Second Amended Second Modification with Exhibit A. The Debtor's Amended Plan,

as modified by the Plan Modifications, is referred to in this Opinion as the "Plan".

 Hays County and Hays County CISD (collectively "Taxing Authorities") initially filed Objections to confirmation of Debtor's Amended Plan (dkt# 64, 70). At the Plan confirmation hearing, the Debtor's counsel advised the Court that the Taxing Authorities' objections had been resolved by agreement with the Taxing Authorities and the Debtor memorialized such agreement in a Plan Modification (dkt# 107, §4.1.2). The Taxing Authorities did not appear at the Plan confirmation hearing or pursue any objections at the Hearing, and the Court considers their objections resolved by such Plan Modification.

Whitney Bank filed an Objection to confirmation of the Debtor's Plan on February 25, 2013, setting forth certain objections to Plan confirmation (dkt# 68). The Debtor filed a Response to Whitney Bank's Objection on March 4, 2013, and a Trial Brief regarding cramdown interest rates on April 3, 2013 (dkt# 80, 99). Whitney Bank filed a Supplemental Objection to the Debtor's Amended Plan on April 15, 2013 (dkt# 101). Whitney Bank's objections to confirmation of the Debtor's Plan remain unresolved and are the primary subject of this Opinion.

The Debtor filed a Ballot Summary with ballots on March 4, 2013, setting forth how creditors and interest holders voted on the Amended Plan (dkt# 79) ("Ballot Summary"). Class III (Whitney Bank) voted to reject the Amended Plan. Class IV (general unsecured creditors) accepted the Amended Plan, by virtue of the vote in favor of the Amended Plan by non-insider Seton Hospital on its $500,000 proof of claim. Class V (Subordinated Claims) voted to accept the Amended Plan, by virtue of the vote in favor of the Amended Plan by insider Kyle Investment Group LLC, a limited partner of the Debtor ("Limited Partner") on its $11.5 million claim. SCC Kyle Partners GP, LLC, general partner of the Debtor ("General Partner") and Horizon Land Company, LLC ("Horizon") also cast ballots to accept the Amended Plan, although neither has a scheduled claim or has filed a proof of claim.

### 2. Motion to Dismiss

On February 15, 2013, Whitney Bank filed a Motion to Dismiss Case or to Convert Debtor's Case to Chapter 7 (herein "Motion to Dismiss") (dkt# 57). Whitney Bank contends that "cause" exists to dismiss or convert the Debtor's case to Chapter 7 under §1112(b) of the Bankruptcy Code. In general, Whitney Bank alleges continuing losses to the Debtor's estate, no reasonable likelihood of an effective rehabilitation of the Debtor, and the Debtor's estate has been grossly mismanaged.

### 3. Motion for Relief

On February 19, 2013, Whitney Bank filed a Motion for Relief from the Automatic Stay (herein "Motion for Relief") (dkt# 59). Generally, Whitney Bank contends that the Court should lift the stay and permit Whitney Bank to foreclose on the Kyle Property because (1) the Kyle Property is not necessary for an effective reorganization because

there is no possibility of a successful reorganization within a reasonable time; (2) the Debtor has not filed a plan of reorganization that has a reasonable possibility of being confirmed; and (3) the Debtor's bankruptcy was filed in bad faith. The Debtor filed a Response to Whitney Bank's Motion for Relief on March 5, 2013 (dkt# 82). In general, the Debtor contends that there is a substantial equity cushion in the Kyle Property that adequately protects Whitney Bank, the Debtor has timely filed a confirmable plan of reorganization, and the Kyle Property is essential to its plan of reorganization.

### 4. <u>Continuance/Failed Mediation</u>

On February 27, 2013, the Debtor and Whitney Bank filed a Joint Motion for continuance of the hearing on confirmation of Debtor's Amended Plan, Whitney Bank's Motion to Dismiss, and Whitney Bank's Motion for Relief (herein collectively "<u>Contested Matters</u>") (dkt# 72). The parties jointly requested that the hearing on the Contested Matters be continued and reset to April 4 or 5, 2013. The Court accommodated the parties' request, and entered an Order granting the continuance and set the Contested Matters for hearing on April 4, 2013 (dkt# 74).

After the Hearing was concluded, the Court entered an Order requiring a Plan Mediation between the Debtor and Whitney Bank (dkt# 103). Unfortunately, the Plan Mediation was not successful (dkt# 124).

III.
**FINDINGS OF FACT WITH FACTUAL BACKGROUND**

On April 4 and 16, 2013, the Court conducted the consolidated Hearing. Five witnesses testified at the Hearing: (1) Scott Deskins ("Mr. Deskins"), the president of the General Partner of the Debtor; (2) John Lee ("Mr. Lee"), Whitney Bank's representative; (3) John Coleman ("Mr. Coleman") of the Aegis Group Inc. ("Aegis"), the Debtor's real estate appraiser; (4) Gerald Teel ("Mr. Teel"), Whitney Bank's real estate appraiser; and (5) Phillip Plant ("Mr. Plant"), a representative of a Limited Partner of the Debtor. Exhibits were admitted into evidence by both the Debtor ("Debtor Ex.") and Whitney Bank ("Whitney Bank Ex.").

**A.  Kyle Property Development and Whitney Bank Financing**

The Debtor owns commercial real estate (herein "Kyle Property") in a development known as the "Village at Kyle", which is located in the City of Kyle, Texas. The Kyle Property is located at the intersection of Interstate Highway 35 and Kyle Parkway (FM 1626) in the City of Kyle, Texas.

In 2005, principals of the Debtor began discussions regarding the purchase of a 147-acre tract of land in the City of Kyle, Texas. The Debtor was then formed in 2007 for the purposes of acquiring, developing, selling and operating the Kyle Property, to be developed by the Debtor as the "Village at Kyle". Mr. Deskins (on behalf of the Debtor) testified at the Hearing that the Debtor intended to develop such property after acquisition, which would include building a retail project with 900,000 square feet of retail store space.

The Debtor's acquisition of the Kyle Property closed in September 2007 for a purchase price of around $27 million. The Debtor's purchase of the Kyle Property was financed by a loan advance of about $18 million from Whitney Bank acting as agent for a group of lenders (Whitney Bank Ex. 17). The Debtor's Limited Partners initially funded the Debtor with about $11 million for the acquisition and development of the Kyle Property.

In connection with the purchase, the Debtor entered into a loan agreement with Whitney Bank, which was amended on October 31, 2007 by the First Amended and Restated Construction Loan Agreement ("Loan Agreement") (Whitney Bank Ex. 1). To secure the loan, the Debtor executed a Deed of Trust on the Kyle Property in favor of Whitney Bank (Whitney Bank Ex. 2). Whitney Bank also obtained an assignment of reimbursement contract and proceeds and an assignment of leases and rents on the Kyle Property (Whitney Bank Exs. 7 and 8). Whitney Bank also initially committed (subject to certain conditions and limitations) to provide the Debtor with additional funding up to a total of about $122 million, for construction and retail development of the Kyle Property. *See* Loan Agreement (Whitney Bank Ex. 1, p. 5).

6

The Debtor then commenced developing the Kyle Property, which started with the project infrastructure—zoning and platting, building roads and drainage improvements, and installing utilities—and dedication of property for detention ponds, roads and common area.  As part of the Debtor's development, the Debtor entered into Economic Development Incentive Agreements ("Incentive Agreements") with Hays County and the City of Kyle ("City") (Debtor Ex. 12). In general, the Incentive Agreements provide the Debtor with revenue based on a percentage of the sales tax revenue collected from retail businesses located at the Village at Kyle development.

When the real estate market then soured during the 2008–2009 recession, the value of the Kyle Property became less than the outstanding amount owed to Whitney Bank, according to the view of Mr. Lee (Whitney Bank's representative) that testified at the Hearing. Originally, Whitney Bank committed to make a construction loan to fund vertical construction and improvements (retail stores and buildings) on the Kyle Property, subject to certain limitations and conditions. According to Mr. Lee, because of the recession and diminished value of the Kyle Property, Whitney Bank stopped advancing funds to the Debtor in August 2009 and did not make the construction loan. Consequently, the Debtor was unable to develop and construct any vertical (building and retail store) improvements on the Kyle Property, and only completed the development infrastructure.

Mr. Deskins testified that Whitney Bank's failure to fund the construction loan for the Kyle Property development project turned the Debtor into a "land seller"—instead of a complete real estate project developer as originally contemplated. As a result, by 2009 the business of the Debtor became selling tracts of the Kyle Property to others for construction of buildings and retail stores, and this has remained the Debtor's business through its bankruptcy filing.

In March 2011, the Debtor entered into a Second Amendment to Loan Documents and a separate Modification Agreement with Whitney Bank (collectively "Loan Modification") that restructured the loan (Whitney Bank Exs. 5 and 6). The Loan Modification extended the loan maturity date from September 2010 to January 2, 2012 (Whitney Bank Ex. 5 p. 3, Ex. 6 p. 2). The Loan Modification set the interest rate on the Debtor's loan at LIBOR plus 3%, with a 4% floor (Whitney Bank Ex. 5 p. Annex. I-1). Mr. Lee (on behalf of Whitney Bank) testified that the interest rate under the Loan Modification was 4%, because LIBOR was always under 1%. According to Mr. Deskins, as part of the loan modification, the Debtor's partners contributed over $2 million in additional capital and Whitney Bank released Mr. Deskins from his personal guaranty for a $1 million payment. All told, it appears that the Debtor's partners have contributed approximately $13 million to the Debtor, and to date have not received any return on their investment.

When the loan matured on January 2, 2012, the Debtor did not have the funds to pay off the entire outstanding debt to Whitney Bank. Following failed negotiations and tired of waiting to be completely paid off, Whitney Bank posted the Kyle Property for foreclosure to be conducted on September 4, 2012. The Debtor filed Chapter 11

bankruptcy on August 31, 2012 and prevented the scheduled foreclosure.

## B. **Kyle Property Sales**

### 1. **Pre-Bankruptcy Sales**

Before entering bankruptcy, the Debtor had been quite successful in selling much of the Kyle Property acreage. In August 2008, the Debtor sold a 12.41-acre tract to Lowe's Home Center for approximately $2.7 million. In January 2009, International Bank of Commerce bought a 1.25-acre tract from the Debtor for about $1.9 million. In February 2009, SCC Kyle Drug Store Ltd., an entity related to the Debtor, bought a 1.4-acre tract from the Debtor for about $828,000 and developed a retail strip center. In February 2009, Broadway National Bank purchased a 1.12-acre tract from the Debtor for about $1.15 million. In March 2009, Halle Properties LLC bought a 1.15-acre tract from the Debtor for about $800,000 and built a Discount Tire store. In April 2009, Randolph-Brooks Federal Credit Union bought a 1.44-acre tract from the Debtor for about $1.32 million.

More recently, in August 2012, the Debtor sold a 17.66-acre tract to Wal-Mart Real Estate Business Trust ("Wal-Mart") for about $6.46 million. Whitney Bank received the vast majority of the sale proceeds—minus closing costs and property taxes—from the sales of these tracts of the Kyle Property to reduce its debt. By the time of the Debtor's bankruptcy filing, Whitney Bank's debt had been reduced from a high of about $27.2 million to about $14.3 million—an almost 50% reduction. *See* Loan History (Whitney Bank Ex. 17). Whitney Bank posted the Kyle Property for foreclosure about one week after the Wal-Mart sale was completed and Whitney Bank had received about $6 million of those sales proceeds. *See* Loan History (Whitney Bank Ex. 17).

As of the Debtor's bankruptcy filing, approximately 50 acres of the Kyle Property remained owned by the Debtor and available for sale.

### 2. **Post-Bankruptcy Sales**

The Debtor continued its business of selling tracts of the Kyle Property after its bankruptcy filing with Court approval. On November 14, 2012, the Debtor filed its Motion for Authority to Sell Real Estate Free and Clear of Liens under 11 U.S.C. §363(f) ("First Motion to Sell") (dkt# 20). The First Motion to Sell sought Court approval to sell a 3.2-acre tract of the Kyle Property to Avail Health Care Ventures, LLC ("Avail") for a price of about $1,533,312. On November 15, 2012, the Debtor filed its Second Motion for Authority to Sell Real Estate Free and Clear of Liens under 11 U.S.C. §363(f) ("Second Motion to Sell") (dkt# 24). The Second Motion to Sell sought Court approval to sell a 0.73-acre tract of the Kyle Property to Bridgestone Retail Operations, LLC ("Bridgestone/Firestone") for about $850,000. Whitney Bank filed Responses to both the First Motion to Sell and Second Motion to Sell and attended the hearing on both sales (dkt# 35, 36).

Following hearing on December 3, 2012, the Court approved the sale to Avail ("Avail Sale") by Order entered on December 17, 2012 ("Avail Sale Order") (dkt# 42). After the hearing on December 3, 2012, the Court also approved the sale to Bridgestone/Firestone ("Bridgestone/Firestone Sale") by Order entered on December 17, 2012 ("Bridgestone Sale Order") (dkt# 43).

The Bridgestone/Firestone Sale ultimately closed on March 25, 2013—about three months after the Debtor's projected closing date of the fourth quarter of 2012. Whitney Bank received the sales proceeds (less closing costs and property taxes) of about $800,000 from the Bridgestone/Firestone Sale. According to Mr. Lee's testimony at the Hearing and Whitney Bank's records, the Bridgestone/Firestone Sale proceeds were applied by Whitney Bank to reduce the principal amount of its debt. *See* Loan History (Whitney Bank Ex. 17).

The Avail Sale finally closed on May 3, 2013, after completion of the Hearing on Plan confirmation in April 2013 (dkt# 115). The closing was delayed, as the Debtor had initially projected the Avail Sale would close in the first quarter of 2013. The gross sale proceeds from the Avail sale was approximately $1.5 million, and Whitney Bank received the net sales proceeds after payment of closing costs and property taxes.

The Debtor filed a Third Motion for Authority to Sell Real Estate Free and Clear of Liens Under 11 U.S.C. §363(f) on February 4, 2013 ("Third Motion to Sell") (dkt# 55). Through this Motion, the Debtor sought Court approval of a contract to sell a 0.684-acre tract to Horizon Land Company LLC ("Horizon") for $850,000, with an option for Horizon to purchase an additional 1.33-acre tract for $1.4 million ("Horizon Sale") (Debtor Ex. 8). Following hearing on April 4 and 16, 2013, the Court approved the Horizon Sale by Order, as amended (dkt# 109, 122).

At the Hearing, Mr. Deskins testified that the Debtor expects the Horizon Sale to close in the fourth quarter of 2013 to assist in funding the Plan. However, uncertainty exists with respect the closing of Horizon Sale. On cross-examination, Mr. Deskins admitted that based on the terms of the Debtor's contract with Horizon, the sale may not close until 300 days after Court approval. This would put the possible closing date of the Horizon Sale well into 2014, which (as discussed below) would be too late for the Debtor to be able to use the Horizon Sale proceeds to timely pay 2013 property taxes on the remaining Kyle Property when due under the Plan. Curiously, even though the sale contract between the Debtor and Horizon is dated August 21, 2012, the Debtor did not file its Third Motion to Sell with the Court until months later on February 4, 2013 (Debtor Ex. 8). Mr. Deskins also admitted on cross-examination that Horizon's principal shares an office with Mr. Deskins. The Horizon Sale has not closed to date.

If the Debtor is unable to close on the Horizon Sale by the fourth quarter of 2013, then Mr. Deskins testified at the Hearing that the Debtor would still be able to pay its 2013 property taxes from a potential ground lease with Brinker International. The Debtor presented an unsigned Letter of Intent dated July 18, 2012 from Brinker, which contemplates a ground lease of a 1.5-acre tract of the Kyle Property (Debtor Ex. 9). In

9

general, the Letter of Intent provides that the Debtor would receive $110,000 per year for ground lease rent during the first 5 years of the contract and then $121,000 per year for the next 5 years. Brinker—who apparently intends to build a Chili's restaurant on the tract—would then have renewal options, with rent increasing by 10% every 5 years (Debtor Ex. 9). Mr. Deskins testified that he is confident that the Debtor will be able to reach an agreement with Brinker, despite the fact that the Letter of Intent is unsigned and dated almost one year ago.

### C. Whitney Bank Claim/Kyle Property Valuation

Whitney Bank filed a proof of claim for $14,330,445 as the amount of the debt owed by the Debtor as of the date of the filing of the Debtor's bankruptcy petition (claims dkt# 5-1). According to the testimony of Whitney Bank's representative Mr. Lee and Whitney Bank's records, as of March 26, 2013 (after the Bridgestone/Firestone Sale closed and Whitney Bank was paid the sales proceeds), the Debtor owed Whitney Bank $12,991,196 in principal and $845,942 in interest, for a total of $13,837,112 (Whitney Bank Ex. 17).

So, as of the date of the Hearing on Plan confirmation on April 4, 2013, Whitney Bank was owed about $13.8 million.[4] Following the Hearing, the Avail Sale closed on May 3, 2013 for about $1,533,312, and Whitney Bank received the Avail Sale proceeds after payment of closing costs and outstanding property taxes on the tract.

According to Mr. Deskins, the Debtor currently owes about $250,000 in 2012 property taxes, which are secured by the unsold tracts of the Kyle Property.

Mr. Coleman of Aegis (the Debtor's real estate appraiser) credibly testified at the Hearing that the Kyle Property is in an excellent location just off Interstate Highway 35 and at the epicenter of the City of Kyle, Texas. The City is currently growing and with the projected opening of a Wal-Mart store in 2015, the Kyle Property should appreciate in value. Mr. Coleman credibly appraised the "retail sale" value (before a tract was sold to Avail, but after a tract was sold to Bridgestone/Firestone) of the remaining Kyle Property at $25.56 million, and its "bulk sale" value at $18.8 million. *See* Aegis Appraisal (Debtor Ex. 5). Mr. Coleman  testified that selling the remaining Kyle Property at a lower price through one "bulk sale" would not maximize value; instead selling the remaining property through individual tract sales ("retail sales") as contemplated by the Debtor's Plan would bring a much higher value. Furthermore, Mr. Coleman believes the remaining tracts are listed by the Debtor at a market price, and not at a premium.

---

[4] All dollar figures in this Opinion with respect to the outstanding amount of Whitney Bank's claim, as well as payments to be made to Whitney Bank under the Plan, are approximate figures and will not bind either party in any subsequent claims objection or other litigation. As set forth herein, Whitney Bank is oversecured and will likely be also entitled to seek post-petition, pre-confirmation interest and reasonable attorneys fees. *See* 11 U.S.C. §506(b). Hopefully the parties can resolve any claim amount issues, without the need for continual and additional litigation post-confirmation.

Mr. Teel (Whitney Bank's real estate appraiser) appraised the "retail sale" value (before tracts were sold to Bridgestone/Firestone and Avail)—of the remaining Kyle Property at $20.12 million, and the "bulk sale" value at $15.1 million (Whitney Bank Ex. 9). If only the Bridgestone/Firestone tract is removed and the Avail tract is included, then Mr. Teel's estimated retail value of the remaining Kyle Property would apparently be about $19.27 million. Mr. Teel credibly testified that he believed the remaining Kyle Property would appreciate in value at about 5% per year. Mr. Teel also admitted that it was reasonable for the Debtor to sell the remaining Kyle Property as individual parcels (through "retail sales"), instead of through one "bulk sale".

Significantly, both real estate appraisers and Mr. Lee (Whitney Bank's representative) testified that the remaining Kyle Property would be sold out within 5 years. In fact, both appraisers predicted the remaining Kyle Property would be completely sold out within 4 years. There was also no real dispute that Whitney Bank was oversecured (its collateral, the remaining Kyle Property, is worth more than its debt) based on the testimony.

The two appraisers reached their valuations of the remaining Kyle Property by using different comparable sales. Mr. Coleman of Aegis used previous sales at the Kyle Property location and generally used comparable sales closer to the Kyle Property than Mr. Teel. Some of the comparable sales Mr. Teel used were not properties sold for retailer use, and in one instance, Mr. Teel used a multi-family property as a comparable sale. Of significance, Mr. Teel valued the Debtor's tract ultimately sold to Avail at a retail value of only $980,000, even though it later sold to Avail for $1,533,312 (more than $500,000 above Mr. Teel's appraised value). On the other hand, Mr. Coleman valued the Avail tract much more accurately at $1.535 million. Lastly, Mr. Teel used a 15.25% discount rate that included an entrepreneurial profit for the Debtor, while Mr. Coleman used a 12% discount rate without including an entrepreneurial profit. Mr. Deskins testified that the Debtor would not take an entrepreneurial profit out of the sales from the remaining Kyle Property under Plan. The Court finds that Mr. Coleman's appraisal and testimony of value of the remaining Kyle Property to be more credible and persuasive that the appraisal and testimony provided by Mr. Teel on behalf of Whitney Bank.

### D. **Plan Projections**

To support the Debtor's Plan, Mr. Deskins (President of Debtor's General Partner) generated Plan projections (Debtor Exs. 4, 20, 21). Mr. Deskins generated two projections: (1) the first projections based on future sales at 100% of the appraised retail value of the remaining Kyle Property; and (2) the second projections based on future sales at 85% of the appraised retail value. After the first day of the Hearing, Mr. Deskins revised the second projections and separated them into one projection that did not prepay the interest on Whitney Bank's debt from the Avail Sale (Debtor Ex. 20), and another projection that prepaid the interest from the Avail Sale as requested by the Debtor in its Plan (Debtor Ex. 21). The Court finds that Mr. Deskin's testimony and his Plan projections to be both credible and persuasive.

Mr. Deskins testified that he calculated payments to Whitney Bank in both sets of his projections at 8% interest—to show that the Plan was feasible even at the "high" cramdown interest rate of 8% sought by Whitney Bank. The Debtor projects that the remaining tracts of the Kyle Property will be sold out by 2017—in about 4 years. This projection was corroborated by appraisers for both Whitney Bank and the Debtor—who agreed that the Debtor would be able to sell the remaining Kyle Property tracts within 4 years. The Debtor's projections also include the amount that the Debtor will withhold from each sale and deposit in a rolling "Reserve Account" under the Plan, in addition to the Debtor's closing costs (estimated to be 7% of the sale price). The projected closing costs include a 6% broker's fee on each lot to the Debtor's broker—SCC Interests, Inc.—whose principal is Mr. Deskins (Whitney Bank Ex. 24). The Court finds that the 6% broker commission on future sales is a reasonable and customary fee for real estate brokers, and does not believe the Debtor must use an unaffiliated broker because it would still have to bear a broker commission of about 6%. Mr. Deskins is also very familiar with the Kyle Property project having been with it since inception, and no complaint has ever been made by Whitney Bank that Mr. Deskins is selling the Debtor's property at too low a price. Mr. Deskins also explained that the Debtor's attorneys would be paid their administrative claims from revenue generated from the Incentive Agreements under the Plan. Mr. Deskins further testified that the Debtor currently has about $168,000 in cash on hand to assist in initial funding of Plan payments.

The Debtor's revenue from the Incentive Agreements currently averages about $10,000 per month. According to Mr. Deskins, the Debtor's revenues from the Incentive Agreements should double once Wal-Mart opens a store, as he expects the Wal-Mart store to have sales revenue between $80 to 100 million. Over the 5-year term of the Debtor's Plan, the Debtor projects that the Incentive Agreements will generate about $725,000 in revenue for the Debtor (Debtor Ex. 4).

Mr. Deskins credibly testified that since the Wal-Mart tract sale closed, there has been increased interest from various companies in acquiring the remaining tracts of the Kyle Property, including from Academy Sports and TJ Max. But the Debtor has no executed sales contracts with other potential buyers. Although it is not certain when Wal-Mart will open a store, Mr. Coleman and Mr. Teel both testified that based on sources at Wal-Mart, they believe Wal-Mart will open in 2015 after breaking ground in 2014. In addition, Mr. Plant knowledgably testified that real estate has picked up in central and south Texas and that expansion of commercial retail activity will continue to increase.

After accounting for the payments the Debtor will make under its Plan, the Debtor's projections show that the Debtor will be able to complete its Plan payments and pay off Whitney Bank in full (at 8% interest if required) even if the remaining tracts are sold at only 85% of their appraised value. On cross-examination, Mr. Deskins admitted that the Debtor must close the sale on a tract by the fourth quarter of 2013 (like the Horizon Sale) to use the sale's Reserve Account to pay 2013 property taxes on the remaining Kyle Property when due in January 2014.

Overall, the Court finds that the Debtor's Plan projections are reasonable and credible. Mr. Deskins, who prepared the Debtor's projections, was credible, persuasive, and demonstrated intimate familiarity with the Kyle Property and the Debtor's development, as well as real estate development and sales in general. The Court's primary concern with the Debtor's projections is whether the pending Horizon Sale will actually close by January 2014 in time for the Debtor to pay its 2013 property taxes when due. In the recent past, the Debtor has been able to close sales of property, but the actual closings were a few months after the Debtor's projected closing dates. On the other hand, the appraisers for both the Debtor and Whitney Bank agreed that the remaining Kyle Property should be sold out within 4 years and that Whitney Bank is oversecured. The evidence also demonstrated that, if Wal-Mart breaks ground in 2014 and opens a store in 2015, the remaining Kyle Property will be even a more desirable location for other retailers and increase in value, and the Debtor should receive more revenue from the Incentive Agreements.

## E. <u>Interest Rate</u>

Mr. Lee (Whitney Bank's representative) testified that he was familiar with market rates of interest in Texas, and had never seen a loan structured in a manner similar to what the Debtor has proposed for Whitney Bank in its Plan. Mr. Lee stated that no bank would loan at the interest rate proposed by the Debtor (4%) because (in Mr. Lee's view) it has a loan-to-value ratio greater than 50%. On cross-examination, Mr. Lee admitted that based on the appraisal of the Kyle Property by his own appraiser (Mr. Teel), the Kyle Property has a loan-to-value ratio of approximately 61%. Consequently, Mr. Lee stated that there is no market for a loan of the type proposed by the Debtor. Mr. Lee also testified that the default rate of interest under the Whitney Bank loan is 7%, and that he believed 8% interest would be a reasonable market rate for the Debtor's loan.

Mr. Deskins and Mr. Coleman testified that the Plan's proposed 4% interest rate to Whitney Bank was reasonable. Specifically, Mr. Deskins stated that he had recently closed 2 transactions within the previous 180 days at LIBOR plus 2% with a 4% minimum. Mr. Deskins also testified that 4% was appropriate because after the Loan Modification with Whitney Bank, the Debtor was paying 4% interest to Whitney Bank.

The current national prime rate of interest was 3.25% as of the date of the Hearing. Mr. Plant testified at the Hearing that the 90-day Treasury Bill rate was 0.78%.

# IV.
# CONCLUSIONS OF LAW AND LEGAL ANALYSIS

## A. CONFIRMATION OF PLAN

The Debtor filed a Plan of Reorganization on November 29, 2012 and an Amended Plan of Reorganization on January 21, 2013 (herein "Amended Plan") (dkt# 32, 49). Subsequently, the Debtor filed a First Modification, Second Modification, Amended Second Modification, and Second Amended Second Modification with Exhibit A, to its Amended Plan (collectively herein "Plan Modifications") (dkt# 98, 100, 102, 107, 125). The Debtor seeks confirmation of its Amended Plan as modified by the Plan Modifications (herein "Plan"). The only unresolved objections to confirmation of the Plan are those of Whitney Bank.

### 1. Summary of Plan

In general, the Plan provides for the continued operation of the Debtor's present business—selling the remaining Kyle Property tracts individually on a "retail basis"— over a 5-year period. Non-insider creditors will receive payment in full, through deferred payments by the Debtor from the proceeds generated by the ongoing sale of the tracts and from revenues received by the Debtor under the Incentive Agreements. Insider creditors will not receive any payment on their claims (which are subordinated) unless and until all other creditors are paid in full.

In summary, the Debtor's Plan proposes the following treatment of creditors and interest holders:

(A) The priority and secured tax property tax claims of Hays County and Hays County CISD ("Taxing Authorities") (Class II under the Plan) will be paid and treated as follows: (1) such claims will be paid in equal monthly payments by the Debtor over 60 months from the petition date at 12% statutory interest pursuant to §1129(a)(9)(C) of the Bankruptcy Code; (2) upon sale of any tract of the Kyle Property by the Debtor, all unpaid taxes on the tract will be paid in full at closing of the sale; (3) property taxes for 2013 on the remaining Kyle Property will be paid by the Debtor when due in the ordinary course of business; (4) the Taxing Authorities will retain their liens; and (5) in the event of default by the Debtor, after written notice and opportunity for the Debtor to cure, the Taxing Authorities may pursue all available state law remedies. See §4.1.2 of Plan Modification (dkt# 107).

(B) The secured claim of Whitney Bank (Class III under the Plan) will be paid and treated as follows: (1) the Debtor will pay the claim of Whitney Bank in full over 5 years in deferred payments with an interest rate of 4% per year, or such other interest rate determined by the Court not to exceed 8%; (2) Whitney Bank will be paid interest payments monthly; (3) Whitney Bank will also be paid the net proceeds from ongoing sales by the Debtor of the Kyle Property tracts, after

14

payment of (a) customary closing costs; and (b) funding of a one-year rolling reserve account (herein "Reserve Account") for property taxes, insurance, interest payments to Whitney Bank, and operating expenses not to exceed $1,000 per month for bookkeeping/accounting and landscaping/maintenance; (4) the Debtor will be entitled to close any sale of a Kyle Property tract and Whitney Bank's lien on the tract will be released if the gross sales price is a least 85% of the appraised retail value of the tract according to the Aegis appraisal; (5) the Reserve Account will be held at Whitney Bank and Whitney Bank will maintain a lien on the Reserve Account; (6) Whitney Bank will retain its liens on its collateral, including the Kyle Property and the sales tax incentive agreements (herein "Incentive Agreements"); (7) the Debtor will be entitled to use revenues from the Incentive Agreements to the extent available, to pay allowed administrative claims, tax claims, and unsecured claims under the Plan; (8) the net proceeds of the recently closed sale of a tract by the Debtor to Avail (herein "Avail Sale") will be paid to Whitney Bank, and (if allowed by the Court) a portion of the Avail Sale net proceeds will be credited as pre-paid interest to Whitney Bank for the period of May 1, 2013 through December 31, 2013, with the balance of the net sales proceeds credited to reduce principal of Whitney Bank's claim; (9) if the Debtor defaults under its Plan obligations to Whitney Bank, after written notice and a short opportunity for the Debtor to cure (5 days), Whitney Bank may pursue all available remedies (including foreclosure). *See* §4.1.3 of Plan Modification (dkt# 107,125).

(C) The claims of general unsecured creditors (Class IV under the Plan) will be paid by the Debtor in full in 16 quarterly payments; provided the $500,000 general unsecured claim of Seton Family of Hospitals (herein "Seton Hospital") will receive payments totaling only $250,000 over the 16 quarters, with the balance of Seton Hospital's claim to be paid only after Whitney Bank (Class III) is paid in full. *See* §4.1.4 of Amended Plan (dkt# 49), as modified by Plan Modification with respect to Seton Hospital (dkt# 98).

(D) The claims of insiders and affiliates of the Debtor, including claims of the Limited Partners of the Debtor (Class V under the Plan) will be subordinated, and will not receive any payments unless and until the claims of all senior creditor classes are paid in full (including the claims of Whitney Bank, property taxing authorities, and general unsecured creditors). *See* §4.1.5 of Amended Plan (dkt# 49).

(E) Equity interests in the Debtor (Class VI under the Plan) will retain their interests, but shall not receive any payments or distributions on account of such equity interests until all senior classes of creditors are paid in full. *See* §4.1.6 of Amended Plan (dkt# 49).

## 2. **Whitney Bank Objections to Plan**

In general, through its Objection filed to confirmation of the Plan, Whitney Bank contends: (a) the Plan was not proposed in "good faith" by the Debtor under §1129(a)(3)

of the Bankruptcy Code because the Debtor has only one significant asset, no employees other than principals, no ongoing business to reorganize, no cash flows of its own, only one non-insider creditor, failed to pay its 2012 property taxes, failed to close any sales of the remaining Kyle Property, and has insufficient cash on hand and sources of income to fund its Plan; (b) the Plan is not "feasible" under §1129(a)(11) of the Bankruptcy Code, because the Debtor relies on speculative future sales of property to fund Plan payments; and (c) the Plan is not fair and equitable because it does not provide Whitney Bank with the "indubitable equivalent" of its claim under §1129(b)(2)(A)(iii) of the Bankruptcy Code, because the Plan alters its collateral by requiring partial releases of its lien, has a rolling Reserve Account, and shifts the risk of Plan failure on Whitney Bank. *See* Objection (dkt# 68).

Through a Supplemental Objection filed to confirmation of the Plan, in general Whitney Bank contends (a) the Plan Modification filed by the Debtor that provides that a portion of the net proceeds received by Whitney Bank from the Avail Sale will be credited as pre-paid interest to Whitney Bank violates the terms of the Avail Sale Order and is barred by the doctrine of res judicata; and (b) the rolling Reserve Account proposed in the Plan lacks sufficient detail to determine the amount of sales proceeds that Whitney Bank will not receive. *See* Supplemental Objection (dkt# 101).

The Debtor filed a Response to Whitney Bank's Objection, and in general the Debtor contends (a) the Plan was filed in good faith and the Debtor has been acting in good faith as evidenced by the three tracts of land under contract, the income generated by the Debtor from the Incentive Agreements, and the substantial equity that exists in the Kyle Property; (b) the Plan is feasible and based on achievable projections, pending sales of tracts of land, and a future Wal-Mart at the Kyle Property that will increase the value of the surrounding tracts of land owned by the Debtor; and (c) the Plan provides Whitney Bank with the "indubitable equivalent" of its claim because payment of Whitney Bank in full with interest constitutes the indubitable equivalent and the Reserve Account treatment under the Plan is authorized by §1123(a)(5) of the Bankruptcy Code. *See* Response (dkt# 80).

The Debtor also filed a Trial Brief regarding cramdown interest rates, in which the Debtor generally contends (a) the starting point for a cramdown rate analysis should be the U.S. Treasury Bill rate; and (b) Whitney Bank's proposed cramdown rate of 8%–8.25% is based on a starting point of the national prime rate of interest, which is not required. *See* Trial Brief (dkt# 99).

For the reasons set forth in this Opinion, the Court concludes that the Debtor's Plan should be confirmed at a 7% cramdown interest rate and the Objections filed by Whitney Bank to Plan confirmation should be denied.

### 3. Value of Kyle Property

To decide if the Debtor's Plan is confirmable, it is necessary for the Court to determine the current value of the remaining Kyle Property owned by the Debtor.

Section 506(a) of the Bankruptcy Code governs valuation of property, and in pertinent part provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. §506(a)(1). The "proposed disposition or use" of the collateral (here the Kyle Property) is of paramount importance in valuation. *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *see also In re T-H New Orleans Ltd. P'ship,* 116 F.3d 790, 799 (5th Cir. 1997) (value under §506 "is to be determined in light of the purpose of the valuation and of the proposed disposition or use of the property").

Here, in line with the statutory language of §506(a) and this judicial precedent, the Court will value the remaining Kyle Property in accordance with the Debtor's proposed "disposition or use" of the Kyle Property under the Plan. Through the Plan, the Debtor proposes to continue its business of selling individual tracts of the remaining Kyle Property over time on a "retail" basis, and not to sell the Kyle Property in one "bulk" sale. Whitney Bank's own appraiser admitted that it is reasonable for the Debtor to sell the Kyle Property on a retail basis over time instead of through a bulk sale. Thus, the Court will value the remaining Kyle Property based on individual sales of tracts of the Kyle Property over time as proposed by the Debtor under the Plan.

The real estate appraisers for both the Debtor and Whitney Bank focused primarily on the "sales comparison approach" to value the remaining Kyle Property. Generally, under the sales comparison approach, an appraiser analyzes sales of reasonably similar properties and then adjusts the purchase price for those properties to account for differing attributes of the properties. *See e.g.*, *In re Hotel Associates, LLC*, 340 B.R. 554, 562 (Bankr. D. S.C. 2006). When using this approach, the appraiser's selection of comparable properties is important. As the *Hotel Associates* court noted, "the selection of comparable properties and the adjustments to their sales price bear significantly upon the ultimate value established for a subject property, the comparable properties selected and the means of adjusting their sales price must be closely scrutinized." 340 B.R. at 561.

The Court finds that both appraisal experts—Mr. Coleman of Aegis for the Debtor and Mr. Teel for Whitney Bank—have similar experience and credentials. With a relatively "level playing field" as a starting point, the Court has considered the weight, credibility, differences, rationales, and explanations offered by Mr. Coleman and Mr. Teel in support of their respective valuation opinions and their written appraisals.

As discussed above in the Findings of Fact, Mr. Coleman of Aegis (the Debtor's appraiser) appraised the remaining Kyle Property's retail value (which excludes the tract sold to Bridgestone/Firestone, but includes the tract ultimately sold to Avail) at $25.56 million. Mr. Teel (Whitney Bank's appraiser) appraised the remaining Kyle Property's retail value (after excluding the tract sold to Bridgestone/Firestone, but including the tract ultimately sold to Avail) at about $19.27 million.

Overall, the Court finds Mr. Coleman's valuation and appraisal more persuasive

and his testimony more credible than Mr. Teel's valuation and appraisal for several reasons, including those set forth in its Findings of Fact. In short, Mr. Coleman of Aegis used past sales at the Kyle Property and generally used comparable sales closer to the Kyle Property. Mr. Teel included multi-family properties as a comparable sale and other properties that were not as close comparables to the sales used by Mr. Coleman. Tellingly, Mr. Teel undervalued the Avail tract by over $500,000 in his appraisal—Mr. Teel valued the Avail tract at only $980,000, even though it later sold to Avail for $1,533,312. On the other hand, Mr. Coleman valued the Avail tract in his appraisal much more accurately at $1.535 million. Mr. Coleman did not include an entrepreneurial profit in his discount rate, while Mr. Teel included a 3.25% entrepreneurial profit in his discount rate despite the fact that the Debtor will not take such a profit.

After weighing and considering the evidence (including the respective written appraisals) and testimony of the appraisers, the Court concludes that the value of the remaining Kyle Property (excluding the tract sold to Bridgestone/Firestone, but including the tract ultimately sold to Avail) is $25.56 million for the purposes of Plan confirmation. According to Whitney Bank, the outstanding amount of its debt as of the Plan confirmation hearing was about $13.8 million—which was also after Whitney Bank's receipt of the Bridgestone/Firestone Sale proceeds but before its receipt of the Avail Sale proceeds.

In sum, the Court concludes that Whitney Bank is very oversecured and has a substantial equity cushion, because the value of the remaining Kyle Property serving as its collateral (about $25 million, after reduction for outstanding property taxes) is worth almost twice the amount of its outstanding debt (about $13.8 million). *See* 11 U.S.C. §506(a).

### 4. <u>Necessity for Cramdown</u>

For a class of creditors to accept a plan of reorganization, §1126(c) of the Bankruptcy Code requires acceptance by creditors within a class totaling "at least two-thirds in amount and more than one-half in number" of creditors that vote. 11 U.S.C. §1126(c). Here, Whitney Bank held an allowed secured claim of about $14.3 million as of the Plan voting deadline (February 25, 2013), as it filed a Proof of Claim for such amount and no objection had been filed to such Proof of Claim as of the voting deadline. Whitney Bank is the only creditor in Class III of the Plan. Simply put, since Whitney Bank voted to reject the Plan, Class III has rejected the Plan.

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims either accept a plan or not be impaired under a plan, for a plan of reorganization to be confirmed. 11 U.S.C. §1129(a)(8). The saving grace for a debtor to still confirm a plan over a rejecting creditor class is §1129(b) of the Bankruptcy Code—known, in bankruptcy parlance, as "cramdown". Here, as Class III has rejected the Debtor's Plan due to Whitney Bank's vote against the Plan, the Debtor must "cramdown" the secured class with Whitney Bank (Class III) to be able to confirm its Plan.

### 5. **Cramdown of Secured Claim—§1129(b)(2)(A)**

To cramdown a rejecting secured creditor class, the Bankruptcy Code requires that the plan of reorganization be "fair and equitable" to the secured creditor class. 11 U.S.C. §1129(b)(2). Specifically, §1129(b)(2) provides three alternative cramdown standards, and provides in pertinent part:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)    (I) that the holders of such claims *retain the liens securing such claims*, whether the property subject to such liens is retained by the debtor or transferred to another entity, *to the extent of the allowed amount of such claims*; and
(II) that each holder of a claim of such class receive on account of such claim *deferred cash payments* totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; **or**

(iii) for the realization by such holders of the *indubitable equivalent* of such claims.

11 U.S.C. §1129(b)(2) (emphasis and italics added).

Here, the Debtor contends that the Plan satisfies the cramdown standard set forth in §1129(b)(2)(A)(i). Alternatively, the Debtor contends that the "indubitable equivalent" cramdown standard of §1129(b)(2)(A)(iii) is satisfied. The Court will first address the lien retention and cramdown interest rate requirements under the §1129(b)(2)(A)(i) standard with respect to Whitney Bank's treatment under the Plan, before turning to whether the Plan satisfies the alternative "indubitable equivalent" standard of §1129(b)(2)(A)(iii).[5]

---

[5] No party has expressly raised the issue of whether the §1129(b)(2)(A)(ii) standard applies to the Debtor's Plan, and whether or not it this standard has been satisfied. Accordingly, the Court will not expressly address the alternative cramdown standard set forth by §1129(b)(2)(A)(ii), particularly given the girth of this Opinion.

### a.    Retention of Lien—§1129(b)(2)(A)(i)(I)

The first cramdown requirement of §1129(b)(2)(A)(i) is that the secured creditor must "retain the liens" securing its claims "to the extent of the allowed amount of such claims". 11 U.S.C. §1129(b)(2)(A)(i)(I). The Fifth Circuit has held that a secured creditor retains their lien under a plan if the secured creditor has the right to foreclose if the debtor fails to comply with its debt service obligations under a plan. *See In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1169 (5th Cir. 1993). Here, the Debtor's Plan expressly provides that Whitney Bank will "retain its liens on the collateral currently pledged" to Whitney Bank (which would include the Kyle Property), although the Debtor will have the right to use revenues from the Incentive Agreements to pay other creditors. The Debtor's Plan also expressly provides that "in the event of default" by the Debtor under the Plan provisions and a short opportunity to cure, that Whitney Bank "shall be entitled to pursue all available remedies"—which certainly would include foreclosure on the remaining Kyle Property that serves as its collateral. *See* §4.1.3 of Plan (dkt# 107). Thus under a simple view of the "lien retention" requirement set forth by §1129(b)(2)(A)(i)(I), the Debtor's Plan satisfies the requirement.

Whitney Bank however, is not taking a simple view of this requirement—it is taking a complex view. Whitney Bank contends that its liens are not being retained under the Plan, as the Debtor is withholding a portion of the sales proceeds from Whitney Bank from future sales of the Kyle Property tracts and putting it into a rolling Reserve Account, while the Plan requires Whitney Bank to release its lien on the sold tract. Upon close examination however, Whitney Bank's contention fails for several reasons.

First of all, the Debtor's Plan expressly provides that Whitney Bank will have a lien on the Reserve Account. In fact, the Debtor is required to maintain the Reserve Account at Whitney Bank under the Plan. *See* §4.1.3 of Plan (dkt# 107). Simply put, Whitney Bank is retaining its lien on the portion of the sales proceeds that go into the Reserve Account, as the Plan expressly grants and retains Whitney Bank's lien on the Reserve Account.

Second, the funds in the Reserve Account will be used by the Debtor under the Plan for the direct and indirect benefit of Whitney Bank—by paying monthly interest to Whitney Bank, by paying senior lien property taxes on Whitney Bank's collateral (the Kyle Property), and by paying for insurance on Whitney Bank's collateral (the Kyle Property). Arguably, the only use of the Reserve Account that does not directly benefit Whitney Bank is the operating expenses for bookkeeping/accounting and landscaping/maintenance (the latter of which improves and maintains Whitney Bank's collateral)—but those operating expenses are capped under the Plan at a relatively paltry $1,000 a month. *See* §4.1.3 of Plan (dkt# 107). Meanwhile, Whitney Bank will receive all of the net proceeds (after closing costs and senior taxes) from the future sales of the Kyle Property tracts other than what is deposited in the Reserve Account— Kyle Property tracts that the Court has currently valued at almost twice the debt owed to

Whitney Bank and Kyle Property tracts that Whitney Bank's own appraiser testified should continue to increase in value by about 5% per year. Whitney Bank has a very large equity cushion, and the use of up to $1,000 a month by the Debtor for operating expenses from the Reserve Account does not impact its equity cushion in any meaningful way.

Third, according to the statutory text of §1129(b)(2)(A)(i)(I), a secured creditor must retain its liens under a Plan "to the extent of the allowed amount of such claims". Here, Whitney Bank has an allowed secured claim of about $13.8 million according to its own testimony, which is secured by collateral worth approximately $25 million. Arguably, based on the statutory text, Whitney Bank must only retain a lien in the amount of its $13.8 million secured claim. Based on the structure of the Debtor's Plan and the evidence presented at the Hearing, Whitney Bank will certainly always "retain a lien" to secure its $13.8 million claim, because even as the Debtor sells parcels from the Kyle Property during the course of the Plan, at no point will Whitney Bank have a lien on property that is worth less than the remaining amount owed to Whitney Bank by the Debtor. Therefore, Whitney Bank will "retain its liens" to the extent of its secured claim under the Plan.

So, whether one takes a "simple view" of the lien retention requirement of §1129(b)(2)(A)(i)(I) or a more "complex view" espoused by Whitney Bank, the Debtor's Plan meets the lien retention requirement based on the facts and the Plan in this particular case.

Our facts also resemble a case where a court held that the debtors' plan of reorganization complied with the §1129(b)(2)(A)(i)(I) lien retention requirement because the plan provided that the secured lender would retain its lien and receive payments with an appropriate interest rate from the future sales of condominiums. *See In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 58 (Bankr. D. Mass. 2011) *remanded on other grounds*, 2012 WL 4513869 (BAP 1st Cir. Oct. 1, 2012). The debtors in *SW Boston* proposed to sell their condominiums in the ordinary course of their business, with the proceeds from the sale of the condominiums and the assets and income of the affiliated debtors to be used as necessary to pay allowed claims in full with interest. 460 B.R. at 44. As for the debtors' secured lender, the debtors' plan proposed that the secured lender would retain its prepetition liens on the debtors' property and then be paid the net sales proceeds, defined as the sales price of the condominiums, less 8% for closing costs and the amount necessary to pay outstanding real estate taxes and condominium fees, as well as budgeted operating expenses. 460 B.R. at 44–45. Similarly, in our case the Debtor's Plan will pay Whitney Bank an appropriate interest rate determined by the Court and Whitney Bank will receive the proceeds from future sales of Kyle Property tracts, less closing costs and taxes and the Reserve Account amount that will pay for expenses comparable to those in *SW Boston*.

Although not a legal requirement under §1129(b)(2)(A)(i)(I), the partial release of lien by Whitney Bank on the Kyle Property tract sales under the Plan is not far afield from Whitney Bank's own pre-petition loan documents. *See* Second Amendment to

Loan Documents, §3.7 (Whitney Bank Ex. 5). Such loan document provides for a partial release of lien by Whitney Bank if the Debtor pays Whitney Bank 100% of "Net Sales Proceeds" from the sale of the released tract, or 100% of the "appraised value" of the released tract. Net Sales Proceeds is defined in the loan document as gross sales proceeds, less normal and customary closing costs, including title insurance premiums, survey expenses, market rate sales commissions (not to exceed 6%), and escrow charges, minus estimated federal income taxes. "Appraised value" of the released tract is defined in the loan document as the appraised value as determined by Whitney Bank in its discretion.

Here, under the Plan, the Debtor will be paying Whitney Bank the sales proceeds from the sale of a tract, less normal and customary closing costs (including a 6% broker commission) and less amounts being deposited in the Reserve Account upon which Whitney Bank will have a lien and from which Whitney Bank will be paid interest on its debt. Whitney Bank will also likely be getting its own 100% "appraised value" of a released tract under the Plan according to the loan document. Under the Plan, the Debtor may not sell a tract and obtain a partial release from Whitney Bank unless the sales price of the tract is at least 85% of the Aegis appraised value (prepared by Mr. Coleman). On an aggregate basis, the Aegis appraisal valued the remaining Kyle Property tracts at $25.56 million, and 85% of $25.56 million is about $21.72 million. So basically there are minimum prices built into the Plan that requires the Debtor (on an aggregate basis) to sell the remaining Kyle Property tracts for a total of at least $21.72 million. And Whitney Bank's own 100% appraised value of the remaining Kyle Property tracts (according to its appraiser Mr. Teel) is only $19.27 million—so it appears likely that Whitney Bank will be getting at least its own 100% appraised value for a partial release of a tract under the Plan.

The Debtor also argues that §1123(a)(5) of the Bankruptcy Code permits the Debtor to establish a Reserve Account from a portion of the sales proceeds under the Plan. Section 1123(a)(5) provides that "notwithstanding any otherwise applicable nonbankruptcy law" a plan shall provide adequate means for the plan's implementation. 11 U.S.C. §1123(a)(5). The "adequate means" set forth in the statute include "sale of all or any part of the property of the estate, either subject to or free of any lien, or the distribution of all or any part of the property of the estate among those having an interest in such property of the estate" or "satisfaction or modification of any lien". 11 U.S.C. §1123(a)(5)(D) and (E).

The Fourth Circuit has stated that §1123(a)(5) is an "empowering statute" that enlarges the scope of a debtor's pre-bankruptcy rights. *In re FCX, Inc.*, 853 F.2d 1149, 1154–55 (4th Cir. 1988) (holding that "§1123(a)(5)(D) overrides nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same"); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 543 (Bankr. D. Del. 2002) (holding "the provisions of a plan as articulated in §1123(a) can be effected without regard to otherwise applicable nonbankruptcy law"). Although this Court is not comfortable in holding that §1123(a)(5) standing alone authorizes the Debtor to establish a Reserve Account from a portion of the sales proceeds of Whitney Bank's collateral, this section

combined with §§1129(b)(2)(A)(i) and/or (iii) does authorize the Debtor's Reserve Account in this particular case.

For any and all of these reasons, the Court concludes that the Debtor's Plan satisfies the "lien retention" requirement of §1129(b)(2)(A)(i).

### b. Cramdown Interest Rate

The Court will next address the second requirement under the §1129(b)(2)(A)(i) cramdown standard. In substance, §1129(b)(2)(A)(i)(II) requires a debtor's plan to provide the secured creditor with deferred payments having a "present value" in the full amount of the creditor's secured claim. The Fifth Circuit has recently stated that "present value" in this context means the "deferred payments, discounted to present value by applying an appropriate interest rate (the 'cramdown rate'), must equal the allowed amount of the secured creditor's claim." *Wells Fargo Bank N. A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 330 (5th Cir. 2013).

Here, the Debtor's Plan proposes a cramdown interest rate on Whitney Bank's secured claim of 4% per year, or such other rate as is determined by the Court, not to exceed 8%. *See* §4.1.3 of Plan (dkt# 107).

Notably, the Fifth Circuit has afforded bankruptcy courts discretion in determining a cramdown interest rate, and will not overturn such determination unless there is "clear error". *See Texas Grand*, 710 F.3d at 331 ("We will not tie bankruptcy courts to a specific methodology as they assess the appropriate Chapter 11 cramdown rate of interest; rather, we continue to review a bankruptcy court's entire cramdown-rate analysis only for clear error"); *T-H New Orleans*, 116 F.3d at 800 ("We will not tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate; they have the job of weighing the witness' testimony, demeanor and credibility. Thus, absent clear error, we will not disturb the bankruptcy court's determination").

### c. *Till* Formula Approach to Cramdown Interest Rate

For most courts, a cramdown interest rate methodology begins with review of the Supreme Court's plurality decision in *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). In *Till*, the Supreme Court plurality adopted a "formula approach" (sometimes called the "prime-plus approach") to determine cramdown interest rates in a chapter 13 case. In short, the *Till* approach consists of starting with the national prime rate of interest and adjusting the prime rate upward for risk. 541 U.S. at 479–80.

After *Till*, bankruptcy courts struggled with whether to apply the *Till* approach in a Chapter 11 case, largely because of the now infamous footnote 14 in *Till*. Footnote 14 seemed to suggest that although in Chapter 13 (consumer) cases there is no efficient market of cramdown lenders, the same may not be true in Chapter 11 (business) cases,

and thus "it may make sense to ask what rate an efficient market would produce" in determining a cramdown interest rate in Chapter 11 cases. *Till*, 410 U.S. at 477, fn. 14.[6]

In some respects, the Fifth Circuit clarified the muddy waters of *Till's* application to Chapter 11 cases in its 2013 decision in *Texas Grand.* First, the Fifth Circuit recognized that the *Till* "formula approach" to cramdown interest rates is not controlling precedent in a Chapter 11 case. Instead, many courts have followed the *Till* formula approach because they were persuaded by the *Till* plurality's reasoning, not because they considered it binding. *Texas Grand*, 710 F.3d at 331. Second, the Fifth Circuit noted that the *Till* formula approach has now become the "default rule" in Chapter 11 bankruptcies. 710 F.3d at 336. Third, the Fifth Circuit recognized that the "vast majority" of bankruptcy courts follow *Till* in determining a cramdown interest rate in Chapter 11. 710 F.3d at 333.

Perhaps this should come as no surprise. The Fifth Circuit addressed the issue of cramdown interest rates in Chapter 11 several years before the Supreme Court decision in *Till* and its recent decision in *Texas Grand*. In *T-H New Orleans*, the Fifth Circuit noted that the main objective of the bankruptcy court in determining the appropriate interest rate in a Chapter 11 cramdown is to arrive at a rate that reflects the present value of the claim and "accounts for the specific level of risk". 116 F.3d at 800–01. Similarly, in *Briscoe Enterprises*, 994 F.2d at 1169, the Fifth Circuit noted that a Chapter 11 cramdown interest rate should factor in the "appropriate risk". In many ways, the *Till* formula approach is consistent with these prior Fifth Circuit decisions—as the *Till* approach starts with the national prime rate and then adds a supplemental "risk adjustment". *Till,* 541 U.S. at 541; *Texas Grand*, 710 F.3d at 332.

This Court is mindful that the Fifth Circuit concluded its *Texas Grand* opinion with a statement that the Circuit was not suggesting that the *Till* formula approach is the "only—or even optimal" method for calculating a Chapter 11 cramdown interest rate. 710 F.3d at 337. And the parties in *Texas Grand* stipulated to the use of the *Till* formula approach—a stipulation that does not exist in our case. 710 F.3d at 331.

Nevertheless, this Court is persuaded by *Till* and will use the *Till* formula approach as the path to determine the appropriate cramdown Chapter 11 interest rate under the Debtor's Plan in our case. The Court has chosen this path because the Fifth Circuit has consistently afforded bankruptcy courts discretion in determining a specific cramdown interest methodology, the Fifth Circuit has recently acknowledged in *Texas Grand* that the *Till* formula approach has become the "default rule" followed by a "vast majority" of courts in Chapter 11 cases, the Fifth Circuit reviewed the *Till* approach under a "clear error" standard in *Texas Grand*, and the *Till* formula approach appears consistent with prior Fifth Circuit precedent setting Chapter 11 cramdown rates based on risk.

---

[6] In *Texas Grand*, the Fifth Circuit recognized that footnote 14 in *Till* has been criticized as it rests on the untenable presumption that the voluntary market for a forced cramdown loan is less illusory in a Chapter 11 case than a Chapter 13 case. 710 F.3d at 336–37.

### d. Efficient Market

Some courts have held that a prerequisite to applying the *Till* formula approach in Chapter 11 is a finding that no "efficient market" exists for the cramdown loan, based on footnote 14 in *Till. See e.g., In re Brice Rd. Developments, LLC*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (stating that in a chapter 11 case where an "efficient market" exists, the market interest rate should be applied; but where no "efficient market" exists, the formula approach to interest rates endorsed by the Supreme Court in *Till* should be applied).

The Fifth Circuit has recently recognized that, even assuming footnote 14 of *Till* has some persuasive value, most courts have held that an "efficient market" for financing exists in Chapter 11 only if the market offers a loan with a "term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Texas Grand*, 710 F.3d at 337 (citing *In re 20 Bayard Views, LLC*, 445 B.R. 83, 110–11 (Bankr. E.D.N.Y. 2011); *SW Boston Hotel Venture*, 460 B.R. at 55). It is fair to say the courts "almost invariably conclude" that efficient markets are absent in a Chapter 11 case. *See Texas Grand*, 710 F.3d at 333 (supporting citations omitted).

Assuming, for the moment, that the lack of an "efficient market" is a predicate to applying the *Till* formula approach—the Court has little trouble concluding that no "efficient market" exists in this Debtor's case. The evidence presented by Mr. Lee (Whitney Bank's representative), Mr. Deskins (President of Debtor's General Partner) and Mr. Coleman (Debtor's appraiser) demonstrated that there are no loans available in the current market for a loan similar to that proposed by the Debtor in its Plan. Mr. Lee testified that he had never seen a loan in the marketplace structured in a manner similar to what the Debtor has proposed in its Plan. Mr. Lee also stated that no bank would loan at the interest rate proposed by the Debtor because it has a loan to value ratio greater than 50%. Thus, an efficient market for financing does not exist in our case because the market does not offer a loan with a "term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Texas Grand,* 710 F.3d at 337.

### e. Application of *Till* Formula Approach

The starting point for the *Till* formula approach is the national prime rate of interest; indeed the *Till* approach is often called the "prime-plus approach". *See Texas Grand*, 710 F.3d at 332 (where the Fifth Circuit stated "under the *Till* plurality's formula method, a bankruptcy court should begin its cramdown rate analysis with the national prime rate—the rate charged by banks to creditworthy commercial borrowers—and then add a supplemental risk adjustment"). As of the date of the Hearing, the national prime rate was 3.25%, and that rate has not changed in several years.

The Debtor argued in its Trial Brief and at the Hearing that the Court should start its risk adjustment analysis with the much lower U.S. Treasury Bill rate—not the national prime rate—because the Treasury Bill rate is a truly riskless rate. The U.S. Treasury Bill

rate was under 1% at the time of the Hearing on Plan confirmation. This Court recognizes that the national prime rate of 3.25% already has some risk built into it. *See e.g., Koopmans v. Farm Credit Services of Mid-Am., ACA*, 102 F.3d 874, 875 (7th Cir. 1996) (holding prime rate includes some compensation for the risk of non-repayment). Given this, a few courts have started their upward risk adjustment from the much lower and "risk-free" U.S. Treasury Bill rate, instead of the national prime rate. *See e.g.*, *In re SJT Ventures, LLC*, 441 B.R. 248, 255–56 (Bankr. N.D. Tex. 2010).[7]

However, because the recent Fifth Circuit decision in *Texas Grand* affirmed the use of the national prime rate as the starting point for risk adjustment, the majority of courts start a risk adjustment with the national prime rate, and the *Till* approach starts with the national prime rate, the Court will not use the U.S. Treasury Bill rate as the starting point as suggested by the Debtor. Instead, the Court will start with the prime interest rate of 3.25%, and adjust the prime rate upward for risk in this particular case.

According to the Supreme Court in *Till*, the appropriate size of the risk adjustment to the prime rate depends on such factors as (1) the circumstances of the bankruptcy estate; (2) the nature of the security; and (3) the duration and feasibility of the reorganization plan. *Till*, 541 U.S. at 479; *Texas Grand,* 710 F.3d at 332. In applying these factors, courts have generally approved upward "adjustments of 1% to 3%" to the prime rate. *See Texas Grand*, 710 F.3d at 332 (citing *Till*, 541 U.S. at 480); 710 F.3d at 333, 336 (collecting cases). Courts following the *Till a*pproach assess the risk of the debtor's default on the restructured obligations based on evaluating factors that include: (1) the quality of debtor's management; (2) the commitment of the debtor's owners; (3) the health and future prospects of the debtor's business; (4) the quality of the lender's collateral; and (5) the feasibility and duration of the plan. *Texas Grand,* 710 F.3d at 334 (collecting cases).

Here, the Court has considered and evaluated the circumstances of the Debtor's bankruptcy estate, the nature of Whitney Bank's collateral, the duration of the Debtor's Plan, and the feasibility of the Debtor's Plan—as required by the *Till* approach—which are more fully set forth in its Findings of Fact and Summary of Plan above, including the summary below.

The circumstances of the Debtor's estate have improved in many respects as the real estate market in Central Texas has improved. In short, over the last 10 months that the Debtor has been in Chapter 11, the Debtor has been able to close two sales of Kyle Property tracts (the Bridgestone/Firestone Sale and the Avail Sale) for sale prices aggregating over $2.35 million, and the majority of these sales proceeds were paid to Whitney Bank. Within the last year, the Debtor also closed a very significant sale of a Kyle Property tract to Wal-Mart, which grossed over $6 million, the vast majority of which went to pay down Whitney Bank's debt. As a result, the Debtor had a secured debt-to-asset ratio of around 55% before the Avail Sale (about $13.8 million debt to about $25 million in collateral value to Whitney Bank). So, currently there is a very

---

[7] In the words of the Fifth Circuit, the Treasury Bill rate "includes all necessary factors except the risk premium". *Briscoe Enterprises*, 994 F.2d at 1169.

significant "equity cushion" for Whitney Bank. In addition, the Court recently approved the sale of a Kyle Property tract to Horizon, with an option to purchase additional acreage. However, the Horizon Sale has not closed, and it is not certain whether and when it will close.

The Debtor currently has no regular source of income, other than about $10,000 a month from the Incentive Agreements. The real income the Debtor is relying on for the Plan to succeed is the future sales of real estate—the Kyle Property tracts. This results in risk.

The nature of Whitney's collateral—primarily the Kyle Property—is single asset real estate (herein "<u>SARE</u>") under the Bankruptcy Code. The Kyle Property is not income-producing. The Kyle Property is not fully developed. Instead, the remaining Kyle Property is partially developed raw land with infrastructure-type improvements. By the Debtor's own truthful admission, the Debtor is basically a land seller—a business which defies accurate prediction to some degree. All of this results in risk.

The duration of the Debtor's Plan is 5 years and Plan feasibility is very tight, but achievable. On a positive note, both real estate appraisers felt that the remaining Kyle Property would be completely sold out within the next 4 years. Yet the Debtor currently has no signed contracts for the future sales of tracts—only potential prospects, other than the pending sale to Horizon of a relatively small parcel. The sale to Horizon has not and may not ever close. Worst case (for Whitney Bank under the Plan), if the Debtor defaults under its obligations to Whitney Bank under the Plan, Whitney Bank has an expedient remedy—declare a default and after a short opportunity to cure, foreclose on its collateral (the Kyle Property) through non-judicial foreclosure.

The Plan has features in it that increase the risk for Whitney Bank. The Plan has no set timetable by which the Debtor must sell the Kyle Property tracts and payoff Whitney Bank in full—other than by the end of 5 years. Although Whitney Bank is entitled to fixed monthly interest payments under the Plan, exactly when and how much Whitney Bank will get paid down on the principal amount of its debt is not fixed by the Plan (other than within 5 years). Given this, risk is created.

Also under the Plan, the Debtor cannot sell a tract unless the gross sales price is at least 85% of appraised value. The Debtor is relying on these future tract sales to fund the Plan and pay off Whitney Bank as well as property taxes—but is restricted from selling for less than 85% of a minimum pre-set appraised value. The Court understands the need for and the protection provided by the minimum sale prices in the Plan. But the minimum price restrictions create a double-edged sword. If the Debtor is unable to find a buyer that will pay at least the pre-set minimum value and can timely close a sale of a tract, there is a likelihood of default under the Plan. Although the Debtor has had some success in closing sales during the bankruptcy case, both the Bridgestone/Firestone Sale and the Avail Sale closed months after the closing dates that the Debtor originally projected. These delays in past closings are likely not the Debtor's fault, but the reality remains. And Whitney Bank is (and perhaps justifiably) concerned that the Debtor may

hold out for higher sale prices of the remaining Kyle Property in an effort to hopefully achieve some ultimate distribution to the Debtor's partners under the Plan. With all that comes risk, for which Whitney Bank must be adequately compensated through a higher interest rate.

The Debtor also has some history of being delinquent on payment of real property taxes. This also creates risk under the Plan for Whitney Bank, as any failure of the Debtor to timely pay property taxes under the Plan could result in foreclosure of the senior liens for property taxes and/or significant monetary tax penalties. The Debtor's Plan is far from risk-free. The Plan relies very heavily on future sales of Kyle Property tracts to make monthly interest payments, yearly expenses, and to pay off Whitney Bank and property taxes. The Debtor must close one sale by the end of 2013 or very early in January 2014 to have funds to be able to pay 2013 property taxes on time. The Debtor projects that it will close on the sale to Horizon before January 2014, but this sale is not an absolute certainty, and the Debtor has in the recent past suffered delays in closing sale transactions. A delay in the closing of a tract sale until after early January 2014 could become fatal to the Debtor and its Plan. That the Debtor is recognizing possible problems in cash flow from land sales over the next several months is demonstrated by a somewhat unorthodox Plan provision that uses proceeds from the Avail Sale to "prepay" interest to Whitney Bank through the end of this year.

The prospects for the Debtor's business have improved with the relatively recent sale of a large tract by the Debtor to Wal-Mart. If Wal-Mart breaks ground and opens a store, it will definitely improve the Debtor's prospects and aid significantly in selling the remaining Kyle Property tracts. But whether and when Wal-Mart will actually break ground and open a store is not certain; and this uncertainty creates some risk.

The Court has no reason to question the quality of the Debtor's management. But the continued financial commitment of the Debtor's owners (the General Partner and Limited Partners) to the Debtor and the Plan is very questionable. Without doubt, the Debtor's partners have made very significant financial contributions to the Debtor in the past, and the Court can understand why the partners would be reluctant to step up again and provide additional cash support now. And the Debtor's partners are in full support of the concept of the Plan—but not enough for them to put (or even commit to put) new money in to enhance Plan success. The simple truth is that the Debtor's owners are not making any cash infusion into the Debtor as part of the Plan and are unwilling to commit to provide any additional funding to the Debtor at a time when the Debtor may need the funds to make Plan payments. Personal guarantees no longer exist on the remaining debt owed to Whitney Bank; and there was no showing that the General Partner of the Debtor had any financial wherewithal. Basically, the Debtor and its owners could walk away with little or no additional repercussions to them if the Plan is not successful. All of these factors increase risk.

In sum, these facts and circumstances present a somewhat rare situation. On the one hand, Whitney Bank—the secured creditor—is very oversecured with a large equity cushion. On the other hand, there is little margin for error and sizable risk in the

Debtor's Plan that is predicated on future land sales.

Considering all of these factors and for the reasons set forth in this Opinion, the Court concludes that a 3.75% risk adjustment above the prime rate of 3.25% is required under the facts and circumstances of this case. The Court recognizes this is a significant upward risk adjustment on the outside of the 1% to 3% general range above the prime rate that courts have often approved as a cramdown rate in other cases. *See Texas Grand*, 710 F.3d at 335–36 (collecting cases). But simply put, under the facts and circumstances of this particular case, this level of risk adjustment is warranted. This results in a 7% interest rate for Class III (Whitney Bank) based on the *Till* formula approach.

The Debtor's proposed Plan interest rate of 4% is too low and not sufficient. But, pursuant to the terms of the Plan, the Debtor requested the Court to determine the appropriate interest rate if a 4% rate was not sufficient. The Court hereby determines that a cramdown interest rate of 7% is sufficient, and will provide Whitney Bank with the "present value" of its secured claim and satisfies the second requirement for a secured creditor cramdown set forth by §1129(b)(2)(A)(i)(II).

In conclusion, the two requirements of secured creditor cramdown under the §1129(b)(2)(A)(i) standard are satisfied, the Plan is fair and equitable with respect to Whitney Bank, and the Plan can be confirmed with a 7% cramdown interest rate over the rejecting Class III creditor Whitney Bank.

### f.    Indubitable Equivalent Standard—§1129(b)(2)(A)(iii)

Alternatively, the Debtor has requested the Court to confirm the Plan and cramdown Whitney Bank under the standard of §1129(b)(2)(A)(iii) of the Bankruptcy Code. A plan may also be fair and equitable if it provides a secured creditor the "indubitable equivalent" of its secured claim. 11 U.S.C. §1129(b)(2)(A)(iii). The debtor bears the burden to prove by a preponderance of the evidence that their plan provides a secured creditor with its indubitable equivalent. *Briscoe Enterprises*, 994 F.2d at 1165. The Fifth Circuit has held that the indubitable equivalent standard is no less demanding than the standards in clause (i) or (ii) of §1129(b)(2)(A). *In re Pacific Lumber Co.*, 584 F.3d 229, 246 (5th Cir. 2009).

In our case, the Debtor argues that the Plan provides Whitney Bank with the "indubitable equivalent" of its secured claim because even though the Debtor is reserving some proceeds from the sales of individual parcels of land, Whitney Bank will remain oversecured and be paid in full with interest during the course of the 5-year Plan.

The indubitable equivalent standard requires "both the absence of any reasonable doubt that the secured creditor will receive the payments to which it is entitled, and that the changes forced upon the objecting creditor are 'completely compensatory,' meaning the objecting creditor is fully compensated for the rights it is

giving up." *In re Investment Co. of The Southwest, Inc.*, 341 B.R. 298, 324 (B.A.P. 10th Cir. 2006). Even though the *Investment Co.* court did not find the indubitable equivalent standard had been met on its facts, the appellate court correctly recognized the principle that a "debtor may be able to tap at least some portion of the equity that has built up in collateral to fund a plan by establishing values by which a secured creditor's lien may be released—without violating the indubitable equivalent requirement. Otherwise, no real estate developer, by definition, could likely ever reorganize." 341 B.R. at 325. The court added that "if release prices are going to be used, their application cannot result in any reasonable possibility that a creditor will not be fully protected at all times until its claim is satisfied." 341 B.R. at 325.

In that same vein, other courts have approved plans that did not pay a secured lienholder all of its collateral sale proceeds, as long as the court is satisfied that there will always be more value in the property than the lender's lien. *See In re Pine Mountain, Ltd.*, 80 B.R. 171 (B.A.P. 9th Cir. 1987); *Affiliated National Bank—Englewood v. TMA Associates, Ltd. (In re TMA Associates, Ltd.*), 160 B.R. 172, 174 (D. Colo. 1993).

For example, in the *Pine Mountain* case, the debtor's plan sought to develop its property in 3 phases that would create 4 separate parcels. After the debtor completed each phase, the debtor intended to sell or refinance each parcel before beginning the next stage. 80 B.R. at 174. The debtor's first lien creditor, who held a promissory note on the property, would receive a new promissory note due 3 years and 3 months from the date of replatting the property at 12% interest (which at the time was 1.5% over the prime rate). The debtor's plan would make 2 payments to the first lien creditor of a fixed amount regardless of the sale price of the parcels; the first after the sale or refinancing of the first parcel, and the second after the sale or refinancing of the second parcel. 80 B.R. at 174. The plan in *Pine Mountain* also subordinated the first lien creditor's lien to a lender who was going to provide the debtor with a construction loan. 80 B.R. at 174. In affirming the bankruptcy court's confirmation of the debtor's plan, the appellate court in *Pine Mountain* held it was unlikely that the first lien creditor's claim would ever become partially unsecured because the property was valued at $1.2 million, the first lien creditor's claim was for $275,000, and the construction loan was for $820,000. 80 B.R. at 174–75. In addition, the *Pine Mountain* court was convinced that once development of the property began, it was likely that the property's value would increase. 80 B.R. at 175. Accordingly, the appellate court in *Pine Mountain* affirmed the cramdown of the first lien creditor under the "indubitable equivalent" standard. 80 B.R. at 174–75.

Similarly, in *TMA Associates*, another appellate court affirmed confirmation of a plan under the indubitable equivalent standard where the plan provided for payment of the lender's debt through future property sales. 160 B.R. at 174. The debtor's plan provided that for every sale that occurred above a minimum release price, the bank's security interest on that portion of the property would be released. 160 B.R. at 174. The plan also included negative amortization on the debt. 160 B.R. at 174. Finally, the plan included a provision that permitted the debtor to repay a guarantor on the debt from sales proceeds after the bank received its proceeds on the minimum release price, but

before the bank received any excess proceeds from the sales. The *TMA Associates* appellate court affirmed confirmation of the plan because it found that there was sufficient protection for the bank and it would be paid in full at the partial lien release prices set forth in the plan. 160 B.R. at 175.

This Court agrees with the rationale in the *Pine Mountain* and *TMA Associates* decisions that allows a debtor to use limited amounts of collateral sale proceeds as long as the lender remains oversecured beyond reasonable doubt and has sufficient protection.

Here, the Court finds beyond a reasonable doubt that Whitney Bank will remain oversecured during the Plan's 5-year term and will remain sufficiently and adequately protected during the life of the Plan. There is a significant equity cushion between the debt owed to Whitney Bank (according the Bank, currently about $13.8 million) and the value of the remaining Kyle Property (about $25 million). Given the appreciating value of the Kyle Property and the minimum sale price restrictions in the Plan, Whitney Bank will remain protected. There are a few rights of Whitney Bank that are being impacted under the Plan—such as the Debtor's creation and use of the Reserve Account with a portion of the sales proceeds, application of Avail Sale proceeds to pre-pay interest for a short period of time, and deferral of fixed principal payments. But in the Court's view, Whitney Bank is being completely compensated for any rights that might be impacted through the Plan, such as by obtaining a much higher interest rate under the Plan (7%) than Whitney Bank was charging under its Loan Modification (4%), having an experienced and credible Debtor (through Mr. Deskins) sell its collateral (the Kyle Property tracts) over time to pay off its debt in full, and the protection of minimum sale and release prices under the Plan. Indeed, one of the reasons that the Court has set the cramdown interest rate this high in the Debtor's case—even though Whitney Bank is very oversecured—is to ensure that Whitney Bank is fully and completely compensated.

Finally, although courts have often applied a cramdown interest rate analysis in the context of §1129(b)(2)(A)(i), courts have also applied the same cramdown interest rate analysis to the "indubitable equivalent" standard of §1129(b)(2)(A)(iii). *See e.g., In re DBSD N. Am., Inc.*, 419 B.R. 179, 208–09 (Bankr. S.D.N.Y. 2009) (finding the proposed interest rate was sufficient to provide creditor with the "indubitable equivalent" of its claim) *aff'd,* 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010) *aff'd in part, rev'd in part on other grounds,* 627 F.3d 496 (2d Cir. 2010); *Matter of James Wilson Associates*, 965 F.2d 160, 172 (7th Cir. 1992) (affirming bankruptcy court's interest rate determination as providing the secured creditor with the "indubitable equivalent" of its secured interest).

Accordingly, the Court's cramdown interest rate analysis set forth at length above under §1129(b)(2)(A)(i) applies to the cramdown of Whitney Bank under §1129(b)(2)(A)(iii).  In sum, the Court concludes that the Debtor's Plan, coupled with a 7% interest rate, satisfies the "indubitable equivalent" standard.

### g. Conclusion—Cramdown of Secured Claim

In conclusion, the Court finds that the Debtor's Plan can be confirmed and cramdown of Whitney Bank's secured Class III claim is appropriate under the standard set by §1129(b)(2)(A)(i) at a 7% interest rate. Alternatively, the Court finds that the Debtor's Plan can be confirmed and cramdown of Whitney Bank's secured Class III claim is appropriate under the "indubitable equivalent" standard set by §1129(b)(2)(A)(iii) at a 7% interest rate. Therefore, the Court concludes the Plan is "fair and equitable" with respect to Whitney Bank's secured Class III claim under §1129(b)(2)(A), and the Plan can be confirmed notwithstanding the rejection of the Plan by Whitney Bank in Class III.

### 6. Application of Sale Proceeds from Avail Sale

The Debtor's Plan has a relatively unorthodox provision that basically provides that a portion of the net proceeds from the recently closed Avail Sale will be paid to Whitney Bank and credited as pre-paid interest to Whitney Bank for the period of May 1, 2013 through December 31, 2013. The Avail Sale was approved by the Court order prior to the Plan confirmation hearing—but the Avail Sale closed on May 3, 2013, shortly after completion of the Plan confirmation hearing.

Specifically, the Debtor's Plan provision states "with respect to the pending sale to Avail, Debtor will remit the sale proceeds (net of closing costs, taxes and commissions) to Lender [Whitney Bank], provided, however, that a portion of the proceeds paid shall be credited as pre-paid interest (at a rate determined by the Court) for the period May 1, 2013 through December 31, 2013 with the balance to be applied as principal reduction." *See* §4.1.3 of Plan (dkt# 107) [added].

In its Supplemental Objection and at the Hearing, Whitney Bank objected to this Plan provision with respect to crediting for pre-paid interest. In short, Whitney Bank contends that the doctrine of res judicata bars this Plan provision, because it constitutes an impermissible "re-litigation" and "modification" of the Avail Sale Order previously entered by the Court on December 17, 2012. *See* Avail Sale Order (dkt# 42).

To begin with, the bankruptcy court is in the "best position to interpret its own orders." *In re Tomlin*, 105 F.3d 933, 941 (4th Cir. 1997) (citing *Matter of Chicago, Rock Island & Pac. R. Co.*, 860 F.2d 267, 272 (7th Cir. 1988)); *In re Fisher*, 242 B.R. 908, 911 (Bankr. E.D. Tex. 1999); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) (bankruptcy courts have jurisdiction to interpret and enforce their own prior orders).

The Fifth Circuit has stated that the elements of res judicata are (1) the parties in the later action are identical to, or at least in privity with, the parties in the prior action; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action concluded with a final judgment on the merits; and (4) the same claim or cause of action is involved in both actions. *Rivet v. Regions Bank of Louisiana,*

*F.S.B.*, 108 F.3d 576, 586 (5th Cir. 1997) *rev'd sub nom. Rivet v. Regions Bank of Louisiana*, 522 U.S. 470 (1998) (citing *United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir. 1994)).

The Court agrees that the first three elements of res judicata are met with respect to the prior Avail Sale Order (same parties, the Avail Sale Order was entered by this Court with jurisdiction, and it is a final order). But the Court disagrees that the fourth element of res judicata is satisfied with respect to Whitney Bank's argument based on the Avail Sale Order. Simply put, *how* the sales proceeds from the Avail Sale would be credited and applied by Whitney Bank was not raised, litigated, or decided in the Avail Sale Order and the same claim or cause of action was not involved.

In pertinent part, the Avail Sale Order previously entered by the Court provides that "it is appropriate for the net sale proceeds from the sale of the Property to be paid to taxing authorities and any lienholders, in order of priority . . . Debtor (and any title company or closing agent or escrow) are authorized and directed to pay the proceeds (net only of allowable closing costs and commissions as set out in the Contract) from the Sale of the Property first for payment of 2012 and Seller's pro-rated 2013 taxes (if applicable) on the entirety of Lot 6, Block A then to the Debtor's secured lender(s) in order of priority upon the Closing." *See* ¶¶8, 12 of Avail Sale Order (dkt# 42). Nothing in the Avail Sale Order addresses or involves *how* the Avail sale proceeds to be received by Whitney Bank in the future would be credited or applied—only that the Debtor was required to *pay* the net sales proceeds to Whitney Bank (secured lender).

Indeed, application and crediting of the Avail Sale proceeds by Whitney Bank was not raised by the Debtor in the Motion it filed with the Court to approve the Avail Sale or Whitney Bank's Response. The Debtor's Motion to authorize the Avail Sale requested the following relief "Debtor requests authority to immediately pay the net proceeds of such sale (after closing costs and commissions) first to any taxing authorities and then to the secured creditor, Whitney Bank". *See* p. 4 of Motion (dkt# 20). Nor was application of the sales proceeds raised in the Response filed by Whitney Bank to such Motion (dkt# 36) or at the hearing held on December 3, 2012 on the Motion. All the parties cared about—at that early relatively stage of the bankruptcy case—was getting Court authorization for the Avail Sale and for the net sales proceeds to be paid to Whitney Bank the secured lender, not how the proceeds would be applied or credited by Whitney Bank. And this is typical in a pre-plan sale of real estate under §363 of the Bankruptcy Code—get Court authorization so the property can be sold and the sale proceeds distributed to the secured lender (get the "money in the bank" so to speak)—and later deal with how the sale proceeds are to be applied to secured debt. Certainly nothing in §363(f) of the Bankruptcy Code (the legal basis for the Avail Sale Motion) requires that *how* sale proceeds would be applied by a secured lender would be adjudicated as part of such a §363(f) sale motion.

Although unorthodox, the Debtor's Plan provision that a portion of the Avail Sale Proceeds will be credited to pre-pay Whitney Bank interest for a very specific period of time (May 1, 2013 to December 31, 2013) does not run afoul of the Bankruptcy Code or

the Avail Sale Order. The actual sale to Avail occurred and closed on May 3, 2013—which was <u>after</u> the Debtor had filed its modified Plan with this crediting provision. The Plan was filed and the Plan confirmation hearing concluded <u>before</u> Whitney Bank even received the Avail sale proceeds. And given Whitney Bank's substantial equity cushion in the remaining Kyle Property, this Plan crediting provision does not significantly harm Whitney Bank's substantial equity cushion.[8]

In conclusion, the Debtor's Plan provision is not a modification or re-litigation of the Avail Sale Order, and is not barred by the doctrine of res judicata.  Whitney Bank's Supplemental Objection to the Plan must be denied. The Court will approve and allow a portion of the proceeds from the Avail Sale received by Whitney Bank to be credited as pre-paid interest at the rate of 7% for the period of May 1, 2013 through December 31, 2013 with the balance to be applied to principal reduction of Whitney Bank's claim, as provided for and requested by the Debtor in the Plan.

### 7. <u>Feasibility of Plan—§1129(a)(11)</u>

Whitney Bank also objected to confirmation of the Debtor's Plan on the basis that it is not feasible. In general, Whitney Bank contends the Plan is not feasible because the Debtor relies on speculative future sales to fund the Plan and the Debtor is unable to predict the identities of potential purchasers or the timing of future sales.

The feasibility requirement is codified in §1129(a)(11) of the Bankruptcy Code, which requires that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor . . . unless such liquidation . . . is proposed in the plan." 11 U.S.C. §1129(a)(11); *In re Save Our Springs (SOS) Alliance Inc.*, 632 F.3d 168, 172 (5th Cir. 2011).

Essentially, this confirmation requirement concerns whether the debtor can realistically carry out its plan. *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). In determining plan feasibility, bankruptcy courts have often examined the following factors: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re M & S Associates, Ltd.*, 138 B.R. 845, 849 (Bankr. W.D. Tex. 1992). However, there is no requirement that the Court consider all six of these factors. *See Save Our Springs*, 632 F.3d at 173.

Though a guarantee of success is not required, the bankruptcy court should be

---

[8] By the Court's rough calculations, this Plan provision effectively requires that about $640,000 be credited as pre-paid interest on Whitney Bank's debt (7% interest on about $13.8 million debt for the 8-month period of May 1, 2013 through December 31, 2013). Given that the gross sales proceeds from the Avail Sale were over $1.5 million and Whitney Bank received the vast majority of such sale proceeds, the amount of the pre-paid interest does not significantly erode Whitney Bank's substantial equity cushion.

satisfied that the reorganized debtor can stand on its own two feet. *See Lakeside Global*, 116 B.R. at 506, fn. 19 (citing *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 378 (1988)). Speculative, conjectural, or unrealistic projections by a debtor cannot support a debtor's prediction of future performance. *See Save Our Springs*, 632 F.3d at 172; *In re Canal Place Ltd. P'ship*, 921 F.2d 569, 579 (5th Cir. 1991).

Returning now to our case, Whitney Bank is correct that the Debtor's Plan relies heavily on future sales of the remaining Kyle Property by the Debtor. But the evidence demonstrated that the Debtor has been successful over the last 10 months in closing 3 separate sales of Kyle Property tracts (Wal-Mart, Bridgestone/Firestone, and Avail) for over $8 million. And the evidence showed that since the Debtor was forced (perhaps in part by Whitney Bank's refusal to fund construction) to become just a "land seller", the Debtor has closed multiple separate sales of Kyle Property tracts. Largely as a result of the Debtor's sales of the Kyle Property tracts, Whitney Bank's debt had been reduced from a high of about $27.2 million down to about $13.8 million as of the Plan confirmation hearing—a reduction of nearly 50%. The "proof is in the pudding" so to speak—the Debtor has sufficiently demonstrated its ability to sell the Kyle Property tracts.

The Court however, shares Whitney Bank's concerns that the Debtor must be able to keep selling and timely closing the remaining Kyle Property tracts in the future for the Plan to be successful. The Court is also mindful that as of the confirmation hearing, the Debtor has only one more fully executed contract for a pending tract sale (Horizon), and there is no absolute guarantee that the Horizon sale will close. The Court has already expressed (ad nauseam) earlier in this Opinion its concerns regarding the risks and feasibility of the Debtor's Plan in setting a cramdown interest rate, and will not repeat all of them verbatim here. But the Debtor's past and recent performance, along with its solid and credible Plan projections, demonstrate that the Plan is feasible, although very tight. And the Court has dealt with the Plan risk by setting the interest rate on Whitney Bank's debt quite high—at 7%— more than double the prime rate. Also, one cannot forget that Whitney Bank is very oversecured, with an almost 50% value equity cushion.

With respect to the Debtor's capital structure, the Debtor has significant assets (Kyle Property currently valued at over $25 million) and income-producing Incentive Agreements. The Debtor also had about $168,000 in cash on hand as of the confirmation hearing. Counting property taxes, general unsecured claims, and Whitney Bank's secured claim, the Debtor's liabilities are in the range of $14–15 million. In the past, substantial cash has been contributed to the Debtor by its Limited Partners—over $11 million.

Although the Debtor's only regular steady income is revenue from the Incentive Agreements, the Debtor's business has earning power—as expert real estate appraisers for both Whitney Bank and the Debtor predicted that the remaining Kyle Property tracts owned by the Debtor would be sold out within the next 4 years. Although

the Court believes such expert appraisers, the Court's primary concern is over the timing of closing the individual tract sales—which appear critical for the Debtor to be able to timely make Plan payments and avoid default. In the short time that the Debtor has been in bankruptcy, two sales (Bridgestone/Firestone and Avail) have been delayed and closed a few months later than the Debtor originally projected. But land sales by a debtor in bankruptcy take time, due to the Court approval process and the comfort level needed for a buyer that the selling debtor's property will not get foreclosed on or its business converted to Chapter 7 liquidation prior to the sale closing. With this Debtor's emergence from bankruptcy with a confirmed Plan, the Court is optimistic that the time needed for this Debtor to close sales to buyers of the remaining Kyle Property tracts will decrease and its ability to promptly close tract sales will improve.

With respect to economic conditions, the evidence demonstrated that the Central Texas commercial real estate market was improving and the City of Kyle is growing. More specifically, Whitney Bank's own appraiser stated that the remaining Kyle Property would likely appreciate in value at around 5% per year. There was evidence that Wal-Mart was expected to break ground in 2014 and open a store in 2015. If this comes to fruition, it would undoubtedly lead to greater revenue for the Debtor from the Incentive Agreements and an even more marked increase in value of the Kyle Property. Although one cannot guarantee that Wal-Mart will break ground and open a store, the objective indicia is there—Wal-Mart has recently invested heavily by purchasing a large tract from the Debtor.

The Court is convinced that the Debtor has experienced and capable management in Mr. Deskins, and it is likely that such management will continue. Mr. Deskins prepared the Plan projections for the Debtor, which were credible, thorough, and persuasive. Although such Plan projections rely on timely future tract sales, they are not mere speculation or conjecture given the Debtor's historical and recent performance in selling tracts of the Kyle Property and the expert testimony from two experienced appraisers. The Debtor's Plan expense projections—offered to demonstrate feasibility—were based on an 8% interest rate to Whitney Bank to show the Court that the Debtor could make the Plan work in their "worst case" scenario of 8% interest. The Court has set the cramdown interest rate for Whitney Bank at 7%, and thus there is some margin for error in the Debtor's Plan projections.

When all of the evidence is considered and weighed by the Court, it concludes that the Plan is feasible, although admittedly very tight. Accordingly, the Court finds that the Debtor's Plan is feasible and satisfies the requirement of §1129(a)(11) of the Bankruptcy Code.

### 8. Good Faith—§1129(a)(3)

Whitney Bank has also objected to confirmation of the Debtor's Plan on the basis that the Debtor did not propose the Plan in "good faith". One of the statutory requirements for confirmation of a plan of reorganization is that a debtor's plan be "proposed in good faith and not by any means forbidden in law". 11 U.S.C. §1129(a)(3).

According to the Fifth Circuit, the bankruptcy judge is "in the best position to assess the good faith of the parties' proposals." *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir. 1984).

That the Kyle Property is single asset real estate ("SARE"), has few employees other than principals, and its business consists of selling its remaining real estate, does not establish "bad faith" as Whitney Bank suggests. The Fifth Circuit has stated that the good faith requirement of §1129(a)(3) must be "viewed in the light of the totality of the surrounding establishment of a Chapter 11 plan" and that a court must keep in mind that the purpose of the Bankruptcy Code is "to give debtors a reasonable opportunity to make a fresh start." *T-H New Orleans*, 116 F.3d at 802. The good faith requirement does not mean the plan must be one which the creditors themselves would design. What is required is that a plan (1) be proposed with the legitimate and honest purpose to reorganize; and (2) have a reasonable hope of success. *T-H New Orleans*, 116 F.3d at 802. Liquidating plans are an appropriate use of Chapter 11. *See Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1352 (5th Cir. 1989).

As already set forth in detail in this Opinion, the Debtor's Plan has more than a reasonable hope of success. The totality of the evidence, as well as the specific evidence, also demonstrated that the Debtor proposed its Plan with the legitimate and honest purpose to reorganize its business by finishing the sale of the remaining Kyle Property and paying off its creditors, including Whitney Bank in full. The Court concludes the Debtor's Plan was proposed in good faith and the requirement of §1129(a)(3) has been satisfied by the Debtor.

### 9. **Impaired Accepting Class—§1129(a)(10)**

The Debtor's Plan has at least two classes of "impaired" non-insider creditors—Class III (Whitney Bank) and Class IV (General Unsecured Claims). Accordingly, §1129(a)(10) of the Bankruptcy Code requires that for a court to confirm a plan, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. §1129(a)(10).

Here, impaired Class III (Whitney Bank) voted to reject the Plan. But, impaired Class IV (General Unsecured Claims) accepted the Plan, by virtue of the vote in favor of the Plan by non-insider Seton Hospital on its $500,000 unsecured Proof of Claim.[9] *See* Ballot Summary (dkt# 79). Seton Hospital's vote to accept the Plan is demonstrated by its ballot signed and returned on February 21, 2013 (dkt# 79, p. 7)—prior to the Plan

---

[9] On December 12, 2012, Seton Hospital filed an unsecured Proof of Claim with supporting documents for $500,000, and filed an unsecured amended Proof of Claim for $500,000 on January 15, 2013 (Claims dkt# 4). Whitney Bank was well aware of the filing of Seton Hospital's Proof of Claim, as Proofs of Claim are public filings in the Debtor's bankruptcy case. Under Bankruptcy Rule 3001(f), Seton Hospital's filed and executed Proof of Claim constitutes prima facie evidence of the validity and amount of its claim.

voting deadline of February 25, 2013 set by the Court in the Disclosure Statement Order (dkt# 51). Seton Hospital was the only creditor that voted in Class IV, and thus Class IV has accepted the Plan. See 11 U.S.C. §1126(c).

For the first time, Whitney Bank argued at the Plan confirmation hearing that the Debtor did not have a legal obligation to pay the $500,000 claim of Seton Hospital because it is based on a charitable pledge, and thus Seton Hospital's vote in favor of the Plan should be disregarded for Plan voting purposes. Well after the Plan voting deadline of February 25, 2013 set by the Court and following conclusion of the Plan confirmation hearing on April 16, 2013, Whitney Bank filed an Objection to the Proof of Claim of Seton Hospital (dkt# 106).[10]

Whitney Bank's argument that Seton Hospital's vote for the Plan should be disregarded for Plan confirmation purposes lacks merit. In short, Seton Hospital held an "allowed claim" under §502(a) of the Bankruptcy Code at the time of Plan voting and therefore was entitled to vote on the Plan under §1126(a) of the Bankruptcy Code.

In pertinent part, §502(a) provides that "[a] claim . . . is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. §502(a). In turn, §1126(a) provides that "[t]he holder of a claim or interest *allowed* under section 502 of this title may accept or reject a plan." 11 U.S.C. §1126(a) (emphasis added). Bankruptcy Rule 3018(a) entitled "Entities Entitled to Accept or Reject Plan", provides in part "[a] plan may be accepted or rejected in accordance with §1126 of the Code within the time fixed by the court pursuant to Rule 3017." As of the Plan voting deadline fixed by the Court (February 25, 2013) and on the date that Seton Hospital cast its accepting vote (February 21, 2013), Seton Hospital held an "allowed claim" under §502(a)—as Seton Hospital had filed a Proof of Claim for $500,000 and no party (including Whitney Bank) had filed an objection to Seton Hospital's claim.[11] If Whitney Bank had wanted to file an objection to Seton Hospital's Proof of Claim prior to voting on the Plan it could have—but it did not. An after-the-voting Objection to a Proof of Claim, simply does not disallow the Proof of Claim for Plan voting purposes.

Indeed, the plan voting process would become meaningless if parties could wait to see how a creditor actually voted on a plan and then, depending upon how the creditor voted, decide if the party wanted to object to the creditor's claim so that the creditor's vote could not be counted for plan voting purposes. This would lend itself to all sorts of possible chicanery in plan voting. Just as importantly, a Court could never decide whether a plan could be confirmed given the voting requirements necessary for plan confirmation, if after-the-voting and after-the-confirmation hearing objections to

---

[10] The Debtor and Seton Hospital have filed a Joint Response to Whitney Bank's Objection to Claim (dkt# 121), which is pending.

[11] Bankruptcy Rule 3007(a) requires that an Objection to "allowance" of a Proof of Claim be in writing and filed with the Court. So, Whitney Bank's objection to the allowance of Seton Hospital's claim was not effective until Whitney Bank filed a written Objection—which was on April 23, 2013 (dkt# 106)—after the Plan voting deadline and Plan confirmation hearing.

claims were permitted to retroactively disallow a creditor from voting. This is exactly why the plan voting rules (set forth by §§1126(a) and 502(a) and Bankruptcy Rule 3018(a)) are structured like they are—a creditor is entitled to vote on its Proof of Claim unless an objection to the Proof of Claim is filed before the voting deadline.

Accordingly, the Court concludes that impaired Class IV of the Debtor's Plan (which includes Seton Hospital) has accepted the Plan, and thus the requirement of §1129(a)(10) of the Bankruptcy Code has been satisfied.

### 10. Plan Modification—§1127

Section 1127(a) of the Bankruptcy Code permits the proponent of a plan (here the Debtor) to modify a plan at "any time before confirmation" and that, after the proponent files the modification of the plan with the court, the "plan as modified becomes the plan". 11 U.S.C. §1127(a). Bankruptcy Rule 3019 further provides if the Court finds "that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan." Bankruptcy Rule 3019(a); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) (if a modification does not "materially" impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the modified plan).

As discussed above, through the Plan Modifications, the Debtor made several technical and clarifying modifications to its Amended Plan (dkt# 98, 100, 102, 107, and 125). There was only one material change, and the only creditor whose treatment was adversely and materially impacted by the Debtor's Plan Modifications is Seton Hospital. The Amended Plan provided that Seton Hospital's $500,000 claim would be paid in full over 16 quarters—but the Plan Modification adversely changed Seton Hospital's treatment to being paid only $250,000 over 16 quarters, with the balance of Seton Hospital's claim to be paid only after Class III (Whitney Bank) was paid in full. *See* Amended Plan (dkt# 49, §4.1.4); First Modification (dkt# 98, §4.1.4). However, Seton Hospital agreed to this Plan modification in writing, as announced by Seton Hospital's counsel at the Plan confirmation hearing—thereby complying with Bankruptcy Rule 3019(a).

The other Plan Modifications were technical clarifications to the Amended Plan— and those dealt with Whitney Bank's treatment—and did not adversely or materially impact other creditors. Whitney Bank had voted to reject the Amended Plan, and its rejecting vote also applies to the Plan Modifications. For the reasons already set forth and addressed in this Opinion, the Amended Plan with Plan Modifications (herein "Plan") can be confirmed over the objection and rejection by Whitney Bank.

Accordingly, the Court concludes that the Debtor's Plan (which includes the Plan Modifications) complies with §1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

11. **Additional Plan Confirmation Requirements—§1129**

The evidence at the Hearing established, and there appears to be no real dispute, that the other requirements for confirmation of the Debtor's Plan set forth in §1129 and all other applicable provisions of the Bankruptcy Code have been satisfied by the Debtor.

12. **Conclusion on Plan Confirmation**

In conclusion, for the reasons exhaustively set forth in this Opinion, the Court determines that the Debtor's Plan should be confirmed with a 7% cramdown interest rate, and that Whitney Bank's objections to confirmation should be denied. Under the facts and circumstances of this case, the Debtor's Plan is fair and equitable as to Whitney Bank (Class III) with a 7% cramdown interest rate under §1129(b) of the Bankruptcy Code, and thus can be confirmed notwithstanding Whitney Bank's rejection of the Plan. The Plan is fair and equitable as to Whitney Bank under the cramdown standard of §1129(b)(2)(A)(i), or alternatively, the cramdown standard of §1129(b)(2)(A)(iii). The evidence demonstrated that the Plan is feasible, the Plan was proposed in good faith, the Plan was accepted by at least one impaired class (Class IV) without counting the vote of any insiders, and the Plan otherwise complies with the applicable confirmation requirements of the Bankruptcy Code.

B. **MOTION TO DISMISS**

Whitney Bank has also filed a Motion to Dismiss Case or to Convert to Chapter 7 (herein "Motion to Dismiss") that was one of the Contested Matters adjudicated at the Hearing (dkt# 57). In general, Whitney Bank contends that "cause" exists to dismiss or convert the Debtor's case under §1112(b) of the Bankruptcy Code, because (1) there are substantial or continuing losses to Debtor's bankruptcy estate; (2) there is an absence of a reasonable likelihood of the Debtor's rehabilitation; (3) there has been gross mismanagement of the Debtor's estate; and (4) the bankruptcy filing by the Debtor was in "bad faith". *See* 11 U.S.C. §§1112(b)(4)(A), (B).

The evidence at the Hearing demonstrated otherwise. For the reasons already set forth in this Opinion, the Motion to Dismiss must be denied. In short, there has been no continuing loss to the Debtor's estate—instead the Debtor has closed the sale of two Kyle Property tracts (the Bridgestone/Firestone Sale and Avail Sale) during this bankruptcy case—for over $2.3 million. Whitney Bank has received the lion's share of these sale proceeds. There is a likelihood of the Debtor's rehabilitation; indeed the Court has just confirmed the Debtor's Plan. There was no probative evidence that the Debtor's estate has been grossly mismanaged; instead the exact opposite is true. The evidence demonstrated that the Debtor's estate has been well and responsibly managed during this bankruptcy case.

Whitney Bank's attempt to "paint it black" and suggest this is a "bad faith" bankruptcy filing by the Debtor is unfounded. It is true this is a single asset real estate

("SARE") case and the Debtor filed Chapter 11 to prevent foreclosure of the remaining Kyle Property by Whitney Bank. But what is also true—and more to the point—is that this particular Debtor has significant and substantial equity in the remaining Kyle Property; that this Debtor has closed sales of real estate just before and after filing Chapter 11 for over $8.5 million, with most of the proceeds being paid to Whitney Bank; and that this Debtor has timely proposed and confirmed a Plan of Reorganization that will enable it to finish the sale of the remaining Kyle Property tracts and pay Whitney Bank in full at an interest rate favorable to Whitney Bank.

For these reasons and the other reasons extensively set forth in this Opinion, "cause" does not exist for dismissal or conversion of the Debtor's case, and the Motion to Dismiss must be denied. The Court will enter an Order denying the Motion to Dismiss.

## C. **MOTION FOR RELIEF**

Whitney Bank has also filed a Motion For Relief From the Automatic Stay (herein "Motion For Relief") that was one of the Contested Matters adjudicated at the Hearing (dkt# 59). Whitney Bank requests relief from the automatic stay to permit Whitney Bank to foreclose on the Kyle Property owned by the Debtor. In general, Whitney Bank contends that relief should be granted (1) for "cause", as Whitney Bank is not adequately protected and the Debtor filed this bankruptcy case in bad faith; (2) because the Debtor does not have any equity in the Kyle Property and the Kyle Property is not necessary to an effective reorganization; and (3) because the Debtor has not filed within 90 days of the bankruptcy petition, a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable period of time or the Debtor has not commenced monthly payments to Whitney Bank within such 90-day period. *See* 11 U.S.C. §§362(d)(1),(2) and (3). The Debtor filed a Response opposing the Motion for Relief (dkt# 82).

The evidence at the Hearing demonstrated that grounds do not exist for granting relief from the automatic stay to permit Whitney Bank to foreclose on the Kyle Property. For the lengthy reasons already set forth in this Opinion, the Motion for Relief must be denied. In short, Whitney Bank is adequately protected, as the Debtor has substantial equity in the Kyle Property, and it is necessary to an effective reorganization.[12] This is not a "bad faith" bankruptcy filing, as the Court has already addressed. The Debtor timely filed a proposed Plan of Reorganization on November 29, 2012 (dkt# 32), which was within 90 days of the Debtor's bankruptcy filing on August 31, 2012. The Debtor's Plan has more than a reasonable possibility of being confirmed, as the Court has in fact confirmed the Debtor's Plan. The Debtor's Plan was confirmed within a reasonable period of time—particularly considering that Whitney Bank and the Debtor jointly requested the Court to continue the hearing on Plan confirmation as well as the hearing

---

[12] The Fifth Circuit has recognized that liquidating plans are an appropriate use of Chapter 11. *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank* (*In re Sandy Ridge Dev. Corp.*), 881 F.2d 1346, 1352 (5th Cir. 1989).

on the Motion to Dismiss and Motion for Relief (dkt# 72, 74), and the number of objections that Whitney Bank has raised to Plan confirmation which the Court has been required to address.

For these reasons, the reasons set forth in the Debtor's Response, and the other reasons extensively set forth in this Opinion, the Motion For Relief must be denied. The Court will enter an Order denying the Motion For Relief.

## V.
## CONCLUSION

*"So let it be written, so let it be done."*[13]

Within 14 days after entry of this Opinion, Debtor's counsel is requested to submit a proposed form of Confirmation Order confirming the Debtor's Amended Plan of Reorganization (dkt#49), as modified by the First Modification (dkt# 98) with respect to Seton Hospital's treatment, and as modified by the Second Amended Second Modification (dkt# 107) with Exhibit A (dkt# 125) with respect to Whitney Bank's treatment and the Taxing Authorities' treatment (herein "Plan"). Such proposed Confirmation Order should incorporate this Opinion by reference, set the cramdown interest rate under the Plan at 7% for Class III (Whitney Bank), approve and allow a portion of the proceeds from the Avail Sale received by Whitney Bank to be credited as pre-paid interest at the rate of 7% for the period of May 1, 2013 through December 31, 2013 with the balance to be applied to principal reduction of Whitney Bank's claim as provided for and requested by the Debtor in the Plan, and deny Whitney Bank's objections to the Plan.

Such proposed Confirmation Order should include and attach as an exhibit one document entitled "Second Modified Plan of Reorganization"—that should consist solely of the Debtor's Amended Plan of Reorganization (dkt#49), as revised with the modification with respect to Seton Hospital's claim as reflected in the First Modification (dkt# 98), and as revised with the modification with respect to Whitney Bank's claim and the Taxing Authorities' claims as reflected in Second Amended Second Modification (dkt# 107) with Exhibit A (dkt# 125)—so that the Plan being confirmed by the Court will be reflected in a single document for future reference by the Court and the parties, instead of in several documents.

# # #

---

[13] Yul Brynner, *Ten Commandments*, circa 1956.